James **PIERCE**, Petitioner,

v.

J. E. **LaVALLEE**, Warden of Clinton Prison, Dannemora, New York, Respondent.

Martin T. **SOSTRE**, Petitioner,

v.

J. E. **LaVALLEE**, Warden of Clinton Prison, Dannemora, New York, Respondent.

William **SaMARION**, Petitioner,

v.

J. E. **LaVALLEE**, Warden of Clinton Prison, Dannemora, New York, Respondent.

Civ. Nos. 7813, 7815 and 7816.

United States District Court
N. D. New York.
May 11, 1962.

---

Jacko & Sandifer, New York City, for plaintiffs, Edward W. Jacko, Jr., Jawn A. Sandifer, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of New York, Albany, N. Y., for respondent, William D. Bresinhan, Asst. Atty. Gen., of counsel.

BRENNAN, Chief Judge.

The background of these actions, brought to declare and enforce the plaintiffs' rights pertaining to the exercise of their religious beliefs, is found in the decision reported under the name of Pierce v. LaVallee, 293 F.2d 233. The three issues raised in the plaintiffs' complaints were disposed of as follows.

The plaintiffs' right to purchase and possess the Quran was disposed of in the above decision. Plaintiffs' contention as to their right to contact a "spiritual advisor" was abandoned. The third claim for relief was remanded to this court in the following language. " * * * the cases (are) remanded for consideration of the claims that plaintiffs were disciplined solely because of their religious beliefs." Pierce v. LaVallee, supra, page 236.

The issue, thus remanded, has been tried to the court. Considerable latitude was afforded the plaintiffs in the matter of the evidence received, some of which related to the contention that plaintiffs had been deprived of their right to contact a spiritual advisor. The court took this position for the reason that petitioners indicated that they desired to withdraw their previous abandonment of that issue. Decision as to whether or not such issue would be determined by this court was withheld at the trial and is now refused in view of the decision of Brown v. McGinnis, 10 N.Y.2d 531. This decision will then be limited to the question as to the discipline of the plaintiffs solely because of their religious beliefs, as indicated in the decision of the Circuit Court above referred to.

The plaintiffs are state court prisoners. At the pertinent times involved, they were confined at Clinton Prison, Dannemora N. Y., by reason of state court commitments. The defendant, at such times, was the Warden of Clinton Prison and charged with the overall duty of supervision of that institution and with the care, custody and safety of the inmates thereof. A considerable portion of the factual background involved in this litigation applies equally to each of the three plaintiffs and same is set out below prior to any narration of facts which are particularly applicable to the individual plaintiffs.

On August 15, 1959, disciplinary action was taken by the prison authorities against each of the three plaintiffs. The action was taken based upon identical reports of a Guard Captain which in substance charged each plaintiff with "agitating". Such reports consisted of a statement to the effect that each plaintiff was a member of the Muslim Brotherhood actively engaged in its activities,

the organization being a source of racial hatred and advocates the use of force as a last resort. In accordance with prison procedure, each of the plaintiffs appeared before the Principal Keeper of the prison and after discussion of the report, a judgment was made depriving each plaintiff of sixty days good time and assigning each to segregation. Each plaintiff claims that the above action was taken and the discipline inflicted solely as punishment for his religious belief and constituted a deprivation of his constitutional right to the exercise of his religion.

Clinton Prison at the times involved had an inmate population of about twenty-two hundred persons of various racial and religious backgrounds or beliefs. About thirty of such inmates were recognized as Muslims. The details of their religious belief were unknown to the prison authorities. There has been in existence at the prison for a number of years a system whereby plots of land in the prison yard of varying dimensions are assigned to inmates for their use during specific hours when yard privileges are available. The plots, thus allotted, about 300 in number, are known as "courts" and are put to use by the assigned inmates for various recreational or educational purposes. One or more of such courts were assigned to and controlled by members of the Muslim organization. This court was enlarged from time to time by the absorption of a neighboring court so that in June 1959, four of said courts had been combined into one large area which was used by members of the organization for their purposes. It is evident that the use of said courts by inmates was encouraged or permitted as an outlet for inmate activities.

In the early part of the year 1959, the activities upon the Muslim court came to the attention of prison officials. In the spring of that year, the prison authorities directed surveillance of the Muslim court and a report by the yard guard of activities therein. The testimony of the guards indicated a more or less continuous activity within the Muslim court.

A larger number of inmates than was usually found gathered at that area and were often addressed by some individual. It was observed that some of those present wore black caps, not usually worn by inmates. It was noted especially for a period prior to August 10, 1959 that upon the approach of a guard to the Muslim court, all conversation and activity ceased so that the guard was unable to hear what was being said. When the guard moved out of hearing distance, conversation resumed and the speaker apparently received the full attention of the group. This action was interpreted by prison officials as indicating discussions, the nature of which was purposely withheld from the prison authorities, which indicated a secretiveness or condition of unrest. On August 10, 1959, the prison authorities made an examination of the homemade "locker" located on the Muslim court. There was found therein and taken therefrom literature and documents relating to the religion of Islam and the Muslim movement. These documents were examined by prison authorities. It was found that there existed an organization known as the "Muslim Brotherhood". This organization had a written constitution which apparently came into existence about April 1959. This instrument is set out as an appendix to this decision. After the documents, so seized, had been examined and appraised by prison officials, the charges, above referred to, were made and the discipline invoked.

Prior to the occurrences of April 10, 1959 and as early as February or March of that year, members of the Muslim group had made oral request for the setting aside of facilities within the prison where they could gather, pray together and conduct their religious services. On March 23, 1959, a proceeding was started in the state court, instituted by Sostre, to require that such facilities be made available. In the early part of July 1959, requests were submitted by the three plaintiffs for permission to purchase a certain edition of the Quran. These requests were refused and this

particular controversy was disposed of in the former decision of the Circuit Court. It may be added that the final disposition of such request was not made until August 25, 1959 after the seizure of the literature on August 10, 1959. Additional facts, particularly pertinent to each of the three plaintiffs, are set out below.

## PIERCE

Pierce was received at Clinton Prison on January 25, 1959. At that time his professed religious faith was that of a Muslim. When he was first received into the prison system, he was registered as a member of another faith. He was assigned to work, under guard, outside the prison walls and had earned good time. He was a member of the Muslim group. He was transferred from Clinton Prison to Auburn Prison on January 25, 1961. He remained in segregation from August 15 until the time of his transfer. He has been subject to additional disciplinary action while in segregation. Pierce is the author of a writing, apparently written and distributed many times which is indicative of his attitude toward prison authorities whom he considers as oppressors. Same is set out in part in the footnote below.[1]

## SOSTRE

Sostre arrived at Clinton Prison in March of 1952 and was transferred to Attica on June 28, 1960. At the time of his admission to the prison system, he was registered as a member of a recognized faith. He embraced the religion

of Islam in 1956. "Well, I am a Muslim. A non-denominational Muslim. I am not registered with any particular sect". He was an active member of the Muslim Brotherhood; was acquainted with its constitution and took the oath described therein. He was confined in segregation from August 15, 1959 to the time of his transfer. Sostre is an intelligent, articulate person who took an active part in the brotherhood affairs, including teaching other members at the court. He was instrumental in initiating legal proceedings designed to obtain additional rights for members of the Brotherhood or to obtain rights withheld from them.

The time length of plaintiffs' confinement in segregation at Clinton Prison was somewhat emphasized in the testimony of the plaintiffs. Although these actions did not involve a contention of cruel and unusual treatment, plaintiffs seem to ask the court to infer that the length of such confinement was associated with the basis thereof. An exhibit, written by Sostre while at Attica Prison, was received in evidence as indicating his disposition relative to his confinement in segregation and the failure of the authorities at Clinton Prison to release him therefrom. A part of this exhibit is set out in the footnote below.[2]

## SaMARION

SaMarion arrived at the Clinton Prison in May 1958 and was transferred to Attica Prison on May 28, 1960. His education terminated after two years in high school. At the time of his admission to the prison system, his adherence to a rec-

---

1. "* * * There can be no love for an enemy. Why it is against the very nature of good men and of life to love the enemy. Would God ask us to do something which He Himself cannot do? No. He hates his enemies. In fact, He tells us in the Bible and the Holy Qu-ran that He will destroy them with hellfire along with those of us."

2. "* * * the same mistake the warden of Dannemora made when he placed four hard-core Mr. Muhammad followers in the box. They took over the box and converted eight dead brothers in the fear that they would be raised upon coming in contact

with us. So his whole security system broke down. As you know Brother, the box is the only weapon that the wardens have to maintain discipline in prison. When the box ceases to work, the entire disciplinary and security system breaks down. This is what happened in Dannemora. When the dead brothers in population became aware that the warden would not put them in the box regardless what they did, they started raising hell in population and taking advantage of the wardens predicament. Eventually the warden had to ship us out of the box to different prisons * * *."

ognized religious faith was noted. During his confinement at Clinton Prison, he embraced the faith of Islam. He was an assistant leader in the Muslim Brotherhood and subscribed to the constitution of that organization. He attended meetings held on the Muslim court and heard discussions concerning "oppressors", "slavemasters" and "enemies". Such discussions, in his opinion, did not constitute religious services. It was one of his duties to enforce the constitution. This plaintiff, while in segregation after August 10, 1959, was charged with violations of prison discipline and remained in segregation until his transfer to Attica. He was later released therefrom and was returned to segregation about a year later.

## DISCUSSION

The law to be applied requires no discussion. The decision involves purely the determination of an ultimate question of fact as indicated by the language of the Circuit Court in the opinion on remand. "Either the plaintiffs were punished solely because of their religious beliefs or they were not. If they were, the defendant's conduct violates both the state statute and the United States Constitution. If the plaintiffs were punished for legitimate reasons, neither law is violated".

■ In our zeal for the protection of freedom of religious belief and practice, the particular circumstances involved may not be overlooked. A large prison population is committed to the custody of a minority of prison employees and authorities. Discipline is necessary for the protection of both the inmates and the public. Prison discipline may on occasions impinge upon fundamental rights. That a public officer has or will violate the constitutional safeguards of the freedom of religion, in this court's opinion must be established by convincing evidence. Such a charge is easy to make in an unverified complaint but the charging party must support it by more than inference or conjecture.

■ Admittedly there existed at Clinton Prison an organization of inmates with inmate leadership dedicated to the formation of secret plans, strategy and policies and further dedicated to the extension of objectives of said organization throughout the state prison system. The organization required of its members irrevocable obedience to its commands and instructions; the undertaking of any mission which they might be called upon to perform and the assistance of a brother member "in all difficulties".

Experience indicates that such an organization is a likely fomenting point for the unrest and frustration of confined inmates. It would seem to follow that the defendant might well be derelict in his duty if he knowingly allowed such an organization to function. The segregation of the three plaintiffs who were apparently considered as some of the leaders in said organization would seem to be a proper, if not a necessary, step in the insurance of discipline and good order within the prison. Plaintiffs' contention that such action was solely the result of vindictiveness on the part of the defendant because of the petty annoyances occasioned by their previous court proceedings or complaints is entirely rejected. From the number of applications for relief made to this court by state court prisoners confined at Clinton Prison, it can be readily concluded that petty annoyances, so occasioned, are a part of the defendant's daily routine.

It should be emphasized that the Muslim Brotherhood, as it existed at Clinton Prison, is not a religion. Rather it is an organization which sets itself up as an adjunct to the Islamic faith. Membership in the Brotherhood and adherence to the principles thereto was the basis of the punishment visited upon the three plaintiffs rather than their belief in the religion of Islam.

It is not often that membership in a secret organization, existing within a prison, is so clearly established as in these cases. Ordinarily such an organi-

zation is not disclosed by a written constitution or confirmed by the writings and testimony of members. Here the defendant, after the receipt of such evidence, acted in a deliberate and considered manner. The writings, seized on August 10, 1959, were examined and evaluated. It is plain that in the considered opinion of the prison authorities, such evaluation warranted affirmative action on their part. Five days later such action was taken as, in the opinion of the defendant, was required. This court finds no basis to conclude that the action, so taken, was violative of plaintiffs' rights.

It is found that the plaintiffs in their individual actions have utterly failed to establish that the punishment or discipline imposed upon them by the defendant on August 15, 1959 was so imposed solely because of their religious beliefs. It is concluded that the complaint in each individual action should be and is dismissed, and it is

SO ORDERED.

## APPENDIX

## CONSTITUTION

NAME.... MUSLIM BROTHERHOOD
MOTTO.... Forward ever—
Backward never

### AIMS & OBJECTS

1. To maintain ourselves and the Muslim Brotherhood as the vigorous, intellectual vanguard of the struggle for complete unity among our brothers by employing the unifying force of Islam.

2. To secure & maintain the complete intellectual unity & awakening of our brothers by promoting the advantages of unity of action and organization through the study of: Islam; our history which has been concealed from us; the struggle for freedom being made by our brothers at home and abroad; and all other pertinent subjects.

3. To build and train leaders for the future struggle so that each member upon his release shall be so equipped, that he will be able to successfully organize his own group or be an asset to any organization he may join.

### INTRODUCTION

Since no movement can endure unless there is a stable organization of trained, selected and trusted men to maintain continuity and carry its program forward to successful conclusion.

And since the more widely our brothers are drawn into the struggle for freedom the more necessary it is to have an organization such as the Muslim Brotherhood to establish unity of action and thereby making it impossible and difficult for demagogues, sell-out men, uncle-toms, traitors, cowards and self-seekers to lead astray any section of the masses of brothers.

And since, in a country like this with a despotic anti-brother and anti-Muslim government, and in addition being inside the prison of the enemy, the more necessary it is to restrict the Muslim Brotherhood to persons who are sincere and going "all the way". These will be trained in the art of combatting all manner of intrigues, deceptions & persecutions thereby making it difficult for anyone to disrupt the programs of the Muslim Brotherhood.

I therefore accept and abide by the laws of the Muslim Brotherhood which are as follows:—

1. I will irrevocably obey and act upon the orders, commands, instructions and directions of the Muslim Brotherhood.

2. I will always serve, sacrifice and suffer anything for the cause for which the Brotherhood stands, and will at all times be ready to go on any mission that I may be called upon to perform.

3. I will always and in all circumstances help a member of the Muslim Brotherhood in all things and in all difficulties.

4. I will make it my aim & duty to foster the cause for which the Brotherhood stands among all the brothers.

5. I will, except as a last resort avoid the use of violence.

## OATH OF ALLEGIANCE

On my life, honor and fortunes, I solemnly pledge and promise that I shall always live up to the aims and aspirations of the Muslim Brotherhood, and shall never under any circumstances divulge any secrets, plans and movements of the Muslim Brotherhood, nor betray a member brother; and if I dare to divulge any secrets, plans or movements of the Muslim Brotherhood, or betray a member brother or the cause, or use the influence of the Brotherhood for my own personal interest, I do so at my own risk and peril.

## MEMBERSHIP

Only brothers shall be eligible for membership and these must accept Islam, the objects, policy, program & discipline of the Muslim Brotherhood.

Any person who is a known informer or a homosexual shall not be eligible for membership. (the rumor that one is an informer, shall, in the absence of evidence to the contrary, bar one from membership).

Application for membership shall be made through a member who shall introduce the applicant to members of the Brotherhood for their acceptance or otherwise.

All new members accepted by the organization shall undergo a probationary period of two months. During this time such probationary member shall be given a copy of the Rules of Court only and such probationary member shall be carefully watched at all times by all members as to his conduct, sincerity and motives of joining the Brotherhood.

During the probationary period, the probationary member shall merely be an observer at Brotherhood meetings and although he may voice his opinion, he shall not vote. He may participate in all activities of the organization except the meetings in which strategy & secret plans are discussed.

It shall be the duty of all full-fledged members to instruct the probationary member on Islam, Arabic and all other projects, activities & studies (except secret plans & strategy) of the Brotherhood and to aid him toward becoming a full-fledged member.

After the two month probationary period, the probationary member shall become a full-fledged member of the Brotherhood only upon an affirmative vote of the members.

Should the probationary member fail to receive the necessary vote, a second vote shall be taken to extend his probationary period for an additional month.

If on the second vote less than the majority of the members vote for extension of the probationary period, the probationary member shall be denied membership.

## MEMBERSHIP DUES AND CONTRIBUTIONS

Each individual member of the organization shall pay monthly dues as determined by the Brotherhood unless exempted therefrom.

The Brotherhood shall maintain a fund (from dues & voluntary contributions), such fund to be used for supplementing the diet of the members and furthering the cause of the Brotherhood only.

## COMMUNICATION

A close liaison shall at all times be maintained between all members of the organization, in prison and out. As far as possible all communications should be done by personal contact, or employing only members as couriers and messengers. Letters & notes on important subjects (in prison) should be written in Arabic (on the outside, letters, telegrams, telephones & cables should be used only for making appointments to discuss business). Discussion of Muslim Brotherhood matters in public places is forbidden.

All members shall upon their release maintain contact with the Brotherhood and aid it from the outside by sending money & packages, books & literature

and by apprising the outside brothers of the struggle of the Muslim Brotherhood.

## MEMBER RECOGNITION

Ordinary handshake with thumb or forefinger pressure; salute (these to be decided upon by brotherhood).

## MUSLIM BROTHERHOOD FLAG

The official colors of the organization shall be: Black, Green, Red. The Brotherhood tri color shall be in horizontal form with Black at the top. (To be decided upon by members).

## ORGANIZATION

Since the Aim & Object of the Muslim Brotherhood is to build and train leaders, and since the basis of Islam is equality, all members shall be officers and all shall have an equal vote in deciding all matters of the organization.

Moreover, since there is a rapid turn-over in the membership due to the release of the members who have short sentences, and the further reduction of our ranks by the implacable enemy who through persecutions (solitary confinement) and drafts to other prisons, is constantly seeking to destroy our organization, it is necessary to appoint one or two assistants to each officer to insure against our organization ever being left without necessary officers to carry on efficiently.

In the event an officer is released, expelled, locked up, or drafted, his assistant shall take his place, and the next man in line (if there is a No. 3 man) shall become his assistant. A sub-officer (No. 3 man) shall be elected by the members.

By this method our organization is indestructable; shall always maintain its continuity; and shall frustrate the enemys attempts to destroy it, since as soon as a member is drafted to another prison it is his duty to organize there a Muslim Brotherhood upon the same lines as the present organization, thereby spreading the unifying & awakening force of Islam among all the brother inmates in all the N. Y. State Prisons.

## COMPOSITION

The Brotherhood shall comprise the following officers: (and any other officers the members shall decide)

(1) Imam
    Asst. Imam
    2nd Asst. Imam
(2) Mufti
    Asst. Mufti
    2nd Asst. Mufti
(3) Secretary
    Asst. Secretary
    Sub-Secretary
(4) Librarian
    Asst. librarian
    Sub-librarian

(5) Treasurer
    Asst. Treasurer
    Sub-treasurer
(6) Colonel (or Gen.)
    Asst. Colonel
    Sub-Colonel
(7) Captain
    Asst. Capt.
    Sub-Capt.
(8) Lieutenant
    Asst. Lieut.
    Sub. Lieut.
(9) etc.

## DUTIES OF OFFICERS

(1) To carry out the policy and program of the organization as laid down by the constitution and resolutions of the members.

(2) To refer problems to the Holy Koran for corroboration and to interpret any particular ordinance found therein in reference to the problem.

(3) To lead the congregational prayers when facilities for prayers are obtained.

(4) To expound Muslim law, history and teach Arabic.

(5) To help organize the duties of the members and to guide and supervise their work.

(6) To enforce the constitution, rules, regulations, standing orders and by-laws of the Brotherhood and to take any action deemed necessary for such purpose whether by way of reprimand or expulsion of an individual member of the organization.

(7) To maintain the finance & fund of the Brotherhood and submit a report and statement of account at each end of the month conference.

(8) To initiate & undertake all such activities as may further the aims & objects of the organization.

(9) To hold meetings once a week (Fridays) & at the end of each month, where all important business shall be discussed and voted upon. However, an emergency meeting may be called by any member upon his motion being seconded.

(10) To manage, control & guide the Brotherhood library and submit a report & statement of all literature and new additions at each end of the month conference.

(11) To keep a record of all important Brotherhood activities and transcribe minutes of all proceedings of organization meetings.

## QUORUM

The number of members which must be present in order to legally transact any business which is binding on the Brotherhood, is an absolute majority of the voting members. No decision or commitment shall be valid if less than an absolute majority of the voting members were present at the time it was made.

## DISCIPLINE

There shall be two modes of disciplining a member:
1. reprimand
2. expulsion

1. Whenever a member feels that the actions or omissions of another member is contrary to the aims & objects of the Muslim Brotherhood, he shall mention it at the Friday meetings, or if the circumstances warrant it, make a motion for an emergency meeting. All parties shall be heard at such meeting including the accused member, and a vote shall be taken on the issue to exonerate or reprimand the delinquent member.

2. Whenever a member has been reprimanded by the majority (Quorum) and still continues his errant action in defiance and to the detriment of the organization, a vote for his expulsion shall be taken at a regular or emergency meeting and upon a majority vote, he shall be expelled from the organization.

A member shall also be expelled for the following reasons:

(A) When he absents himself from the activities of the Brotherhood for thirty (30) days unless he is keep-locked or boxed; in the hospital; lost his yard privileges; or has gone to Court.

(B) When he appropriates for his own use any Brotherhood property without the express consent of the members. No person once expelled can ever be re-admitted to membership in the Brotherhood.

## AMENDMENTS TO CONSTITUTION

The existing constitution or any part thereof may be amended, rescinded, altered. Additions made thereto by resolution must be made by a majority vote at the end of the month meeting.

The Rules of Court may likewise be amended by majority vote.

## MEETINGS

The three types of meetings are:
1. regular meetings (every Friday)
2. emergency meeting (at any time)
3. end of the month conference.

1. The regular meeting shall consist of reviewing the past week's activities & progress; planning the coming week's activities; electing members to new posts or removing members from a position for incompetence or inefficiency; voting full

membership to probationary members; deciding whether a member is ready to take his Muslim Oath (Shahadda); voting to reprimand or expel a member; and all immediate business.

2. The emergency meeting shall only be convened when the business at hand is urgent and cannot wait until the Friday meeting.

3. The end of the month conference shall consist of reviewing the past month activity; reading of reports & statements by the various officers as to the nature & condition of their respective departments & duties. All changes to the Constitution and Rules of Court shall be made at this conference by majority vote. Broad policy and long-range strategy for the coming months shall be laid down at this conference. The specific duties of officers shall be defined; & special committees shall be appointed for specific tasks.

All meetings shall be well-conducted affairs presided over by one of the officers. All who desire to speak shall be heard upon raising his hand and given permission to speak. None shall be interrupted while speaking.

Upon a motion being seconded, the matter shall be voted upon and decided by majority vote. The entire organization shall be bound by the majority resolution.

The meetings shall be conducted in accordance with the rules of parliamentary procedure, and the Secretary shall enter the entire proceedings into the minute book of the Brotherhood.

## HEADQUARTERS

In order to ensure the continuous possession of Headquarters (the Court) upon which the Brotherhood centers its activities, it shall be the duty of every member to have his name entered in the yard-sargeant's file as co-owner of the court.

Upon the release, drafting or expulsion of any member whose name is entered. on the Brotherhood court, it shall be the duty of every member to immediately

enter the name of another member to fill the vacancy.

## MUSLIM BROTHERHOOD HOLIDAYS

1. The Feast (Al Fitre) — April
2. —
3. African Freedom Day — April 22
4. —

(To be decided by members)