334 F.2d 906
 Martin X. SOSTRE, Plaintiff-Appellant,
v.
Paul D. McGINNIS, Commissioner of Correction of the State of
New York, andWalter H. Wilkins, Warden of Attica
State Prison, Attica, New York, et al.,
Defendants-Appellees.
William SaMARION and Thomas L. Bratcher, on Behalf of
Themselves and AllOthers Similarly Situated,
Plaintiffs-Appellants,
v.
Paul D. McGINNIS, Commissioner of Correction of the State of
New York, andWalter H. Wilkins, Warden of Attica
State Prison, Attica, New York,
Defendants-Appellees.
 Nos. 418, 432, Dockets 28785, 28662.
 United States Court of Appeals Second Circuit.
 Submitted No. 418 and argued No. 432, May 25, 1964.
Decided July 30, 1964, Certiorari Denied Oct. 26, 1964, See
85 S.Ct. 168.
 
 Martin X. Sostre, pro se (No. 418).
 Richard F. Griffin, Buffalo, N.Y. (Jacob D. Hyman and Wade Newhouse, Buffalo, N.Y., on the brief), for plaintiffs-appellants SaMarion and Bratcher (No. 432).
 Julius L. Sackman, Principal Atty. (Louis J. Lefkowitz, Atty. Gen. of New York, and William D. Bresinhan, Asst. Atty. Gen., on the brief), for defendants-appellees.
 Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 This is an action brought under 28 U.S.C. 1343 and 42 U.S.C. 1983 by the appellants 'in behalf of themselves and all others similarly situated.' Plaintiffs are inmates of Attica State Prison at Attica, New York. Defendants are the Commissioner of Correction of the State of New York and the Warden of Attica State Prison.
 
 
 2
 Plaintiffs allege that they are 'members' of the Islamic religion, known as Muslims, and followers of the sect led by the Honorable Elijah Muhammad. They complain that they have been denied certain rights with respect to the practice of their religion, including the right 'to attend together congregational worship,' the right to communicate with ministers of their faith and to have such ministers visit the prison and the right to have various religious publications and to carry these publications outside their cells.
 
 
 3
 The relief which the plaintiffs seek includes an order to the defendants to provide congregational religious services and an injunction against 'making, promulgating, maintaining and enforcing any and all rules, regulations or practices which prohibit, prevent or impede Plaintiffs and other Muslim inmates of Attica Prison' from holding or attending congregational services, communicating and conferring with ministers of their religion, receiving religious literature and 'carrying, displaying, discussing or otherwise using' such literature. The plaintiffs also ask that defendants be enjoined 'from making, promulgating, maintaining or enforcing any and all rules, regulations or practices which inflict any punishment or loss of good time or other penalty on Plaintiffs or other Muslim inmates of Attica Prison solely because of the exercise of their freedom of worship in accordance with their faith.'
 
 
 4
 They ask that defendants be ordered to 'nullify' any loss of good time 'or other similar punishment' heretofore imposed on account of plaintiffs' efforts to exercise 'their freedom of religious worship.'
 
 
 5
 The district court entered judgment for the defendants 'on the claim of religious persecution' and otherwise dismissed the complaint on the ground that decision should be withheld while the New York courts were 'given an opportunity to act to safeguard and define the plaintiffs' rights under New York law within the framework of New York's legitimate policies governing penal institutions.'
 
 
 6
 While we reverse and remand for a slightly different disposition of the case, we are basically in agreement with the district court's holding that the state authorities, including its courts, must be given an opportunity to propose workable rules for the administration of the rights claimed by these plaintiffs. We believe, however, that the District Court should retain jurisdiction so that it may act if there should be any unreasonable delay on the part of the state.
 
 
 7
 We accept, as we must, since it is not clearly erroneous, the finding of the district court that the beliefs of the organization with which plaintiffs associate themselves constitute a 'religion.' However, it is obvious from the evidence in the record that the activities of the group are not exclusively religious.[1]
 
 
 8
 To the extent that it is a religion those who profess to follow its teachings have some measure of constitutional protection, even though they are confined to prison and are subject to prison discipline. Cooper v. Pate, 84 S.Ct. 1733 (1964); Pierce v. LaVallee, 293 F.2d 233 (2d Cir.1961). This protection is, however, subject to extensive limitations which would not be applicable were the plaintiffs not prisoners.[2]
 
 
 9
 Moreover, to concede that we are dealing here with a group which has some characteristics of a religious sect is separated by an enormous gap from the conclusion which the plaintiffs press upon us, the conclusion that since it is a religion this sect is subject to the same rules and regulations and must be treated in the same way as are Catholics, Protestants and Jews.
 
 
 10
 But before we reach the question of equality of treatment, we should point out that the practice of any religion, however orthodox its beliefs and however accepted its practices, is subject to strict supervision and extensive limitations in a prison. The principal problem of prison administration is the maintenance of discipline. Attica Prison is a maximum security prison designed for the detention of only the most desperate criminals. No romantic or sentimental view of constitutional rights or of religion should induce a court to interfere with the necessary disciplinary regime established by the prison officials. 'Except in extreme cases, the courts will not interfere with the conduct of a prison, with the enforcement of its rules and regulations, or its discipline,' Childs v. Pegelow, 321 F.2d 487, 489 (4th Cir. 1963), cert. denied, 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964) (citing many supporting cases).[3] A prisoner has only such rights as can be exercised without impairing the requirements of prison discipline. 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).
 
 
 11
 The differences between the beliefs of the Muslims, who, like the plaintiffs, are followers of Elijah Muhammad, and the beliefs of other religions, including, incidentally, the orthodox Islam of several hundred millions of Asians and Africans, are far more striking than the similarities.
 
 
 12
 Father Charles M. Whelan, testifying as an expert in Fulwood v. Clemmer, 206 F.Supp. 370, 373 (D.D.C.1962), said:
 
 
 13
 'I don't know any other religion that teaches racial hatred as an essential part of the faith of the religion. There are many religions which have practiced racial hatred at various times, but this movement is the only movement that I know of which makes it a tenet of the faith that all white people should be hated.'
 
 
 14
 Basic to the problem of prison discipline is the fact that the teachings of Elijah Muhammad include condemnation of the entire white race as wholly 'evil,' composed of devils, murderers, thieves, robbers, scientists at tricks, world snoopers, meddlers and liars.[4] Presenting almost equal difficulty is the Muslims' demand for total segregation between whites and blacks. These Muslims also adopt the position that the Christian religion is loathsome and despicable.[5] When these doctrines are preached openly in the presence of white fellow-prisoners, most of whom are Christians, the result is outrage, resentment and attempts at reprisal.[6] It is for this reason that plaintiffs were not permitted to carry certain Muslim literature from their cells and display or distribute it to others.
 
 
 15
 An example of the kind of literature which is subject to these limitations is the Los Angeles Herald Dispatch which carries a column by Elijah Muhammad. Receipt of this publication is permitted at Attica but prisoners are presumably not permitted to take it from the cells. The Director of Correction of the District of Columbia banned the publication entirely because of information that 'both white and negro inmates were agitated by Mr. Muhammad's inflammatory articles.' (Fulwood v. Clemmer, 206 F.Supp. 370, 375 (D.D.C.1962).)
 
 
 16
 The so-called Muslim Brotherhood, an 'adjunct of the Islamic faith,' is a semisecret organization which was formed by these plaintiffs and others as a kind of government within the prison. Of this organization Judge Brennan said in Pierce v. LaVallee, 212 F.Supp. 865, 869 (N.D.N.Y.1962), aff'd, 319 F.2d 844 (2d Cir.), cert. denied, 374 U.S. 850, 83 S.Ct. 1913 (1963):
 
 
 17
 'Admittedly there existed at Clinton Prison an organization of inmates with inmate leadership dedicated to the formation of secret plans, strategy and policies and further dedicated to the extension of objectives of said organization throughout the state prison system.'
 
 
 18
 Plaintiff SaMarion was an 'assistant leader' of the Brotherhood. The Brotherhood had a constitution[7] which, among other things, provided for kangaroo courts to punish erring members. We have held that the Brotherhood had 'overtones of secrecy and intrigue,' Pierce v. LaVallee, 319 F.2d 844, 845 (2d Cir.), cert. denied, 374 U.S. 850, 83 S.Ct. 1913 (1963).
 
 
 19
 'Riots, prompted by disputes over religiously unacceptable prison food, proselytizing in the exercise yard, and refusals by individual Muslims to obey white guards have occurred in a number of prisons.'[8] At Attica Prison the authorities were fortunately able to nip in the bud a sit-down strike of Muslim inmates in protest against punishment of Sostre. Some of the difficulties with the Muslims at Clinton Prison, another New York penal institution, are described by Judge Brennan in Pierce v. LaVallee, 212 F.Supp. 865 (N.D.N.Y.1962), aff'd, 319 F.2d 844 (2d Cir.), cert. denied, 374 U.S. 850, 83 S.Ct. 1913 (1963).
 
 
 20
 At Lorton Reformatory, a District of Columbia penal institution, riots occurred in which Muslims armed with sticks, stones and pickaxes, ran from building to building breaking plate glass windows and causing damage estimated at between seven and twelve thousand dollars. They were demanding 'a proper respect for their religion' and a separate dormitory.[9] On another occasion the Muslims at Lorton insisted on being served meals before sunup and after sundown during Ramadan.[10] Other racial troubles at Lorton caused by Muslim action are described in Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962).
 
 
 21
 Of the difficulties with the Muslim group at Folsom State Prison, the California Supreme Court said (In re Ferguson, 55 Cal.2d 663, 672, 361 P.2d 417, 421, 12 Cal.Rptr. 753, 757, cert. denied, Ferguson v. Heinze, 368 U.S. 864, 82 S.Ct. 111, 7 L.Ed.2d 61 (1961)):
 
 
 22
 'It is apparent that the Muslim beliefs in black supremacy, and their reluctance to yield to any authority exercised by 'some one (who) does not believe in (their) God,' present a serious threat to the maintenance of order in a crowded prison environment. Even conceding the Muslims to be a religious group it cannot be said under the circumstances here presented that the Director of Corrections has made an unreasonable determination in refusing to allow petitioners the opportunity to pursue their claimed religious activities while in prison.'
 
 
 23
 The particular characteristics of the Muslims obviously require that whatever rights may be granted because of the religious content of their practices must be carefully circumscribed by rules and regulations which will permit the authorities to maintain discipline in the prison. As the California court said in Ferguson, supra, 55 Cal.2d at 675, 361 P.2d at 423, 12 Cal.Rptr. at 759:
 
 
 24
 'Certainly it cannot be said that the prison officials would be acting arbitrarily or unreasonably in withholding a version of any bible or other literature adapted by the Muslim Religious Group to support their doctrines of the supremacy of the black race and segregation from the white race. To so hold would be to compel the prison officials to permit inmates to purchase and disseminate in the prison literature advocating and encouraging the very conduct which the prison authorities may lawfully suppress.'
 
 
 25
 At Lorton Reformatory certain rights were granted to Muslims but each of these rights was hedged about with protective limitations in support of prison discipline. See Sewell v. Pegelow, 304 F.2d 670 (4th Cir. 1962).
 
 
 26
 We do not believe that the Constitution requires the granting of rights free from proper limitations. In this respect we believe that a note in the Columbia Law Review (62 Colum.L.Rev. 1488, 1503-04 (1962)) sets forth the correct position:
 
 
 27
 'Once the imminence of danger is apprehended and proved, it would seem preferable to give the warden the discretion his competence warrants, and uphold all disciplinary measures reasonably necessary to meet the threatening situation. It is conceivable that finding that a religious group presents a 'clear and present danger' would not ipso facto lead to a proscription of all their activities. Normally, the most private and contemplative of religious activities is the reading of one's bible. The Black Muslim Koran, however, is the source of the antiwhite doctrine that prompts many of the disciplinary problems, and Black Muslim services almost invariably involve stirring expositions of the implications of the black supremacy doctrine-- words that may well pervade the behavior of those who attended for the rest of the day. To offer the Black Muslims expurgated bibles and censored sermons would be to engage in the very activities the first amendment was designed to avoid. Thus, upon clear demonstration of the imminent and grave disciplinary threat of the Black Muslims as a group in a particular prison, proscription by prison officials of their activities seems constitutionally permissible.'
 
 
 28
 The problem presented by the Muslim group is not whether they should be permitted to have congregational services, a minister, religious literature, but rather, under what limitations protective of prison discipline they should be permitted these rights.
 
 
 29
 It is of little use for us to announce that because of the religious content of the Muslims' beliefs and practices they must be given the right, even in prison, to follow the dictates of their faith, if we find it necessary immediately to add, 'Of course all these rights are subject to such reasonable rules and regulations as the authorities impose.'
 
 
 30
 In other words the nub of this whole situation is not to be found in the existence of theoretical rights, but in the very practical limitations on those rights which are made necessary by the requirements of prison discipline.
 
 
 31
 It is not the business of the Federal Courts to work out a set of rules and regulations to govern the practices of religion in the state prisons. Surely this is a task for the state authorities to undertake. We do not stop with an empty declaration of rights accompanied by generalities as to proper limitations on those rights. We prefer, having given expression to the requirement that insofar as possible within the limits of prison discipline the Muslims be allowed what they ask for, not to leave it at that, but to request that the state authorities propose the rules and regulations which they believe are necessary.
 
 
 32
 The Supreme Court has approved abstention in litigation arising under the Civil Rights Act. Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). Abstention is appropriate where its purpose is 'the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns,' Harrison v. NAACP, supra at p. 176, 79 S.Ct. at 1030, and where the issues are delicate, Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 172, 62 S.Ct. 986, 86 L.Ed. 1355 (1942), or involve a sensitive state social policy, Railroad Comm'n v. Pullman Co., 312 U.S. 496, 498, 61 S.Ct. 643, 85 L.Ed. 971 (1941).
 
 
 33
 Moreover the present case raises important questions of state law-- the extent of the plaintiffs' rights under Section 610 of the Correction Law, McKinney's Consol.Laws, c. 43, which provides for freedom of worship for prisoners in New York's penal institutions.[11] The state courts have ordered the issuance of administrative regulations implementing Section 610. Matter of Brown v. McGinnis, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791 (1962). We are informed that further litigation involving such regulations is now pending in the state courts.
 
 
 34
 We therefore reverse the judgment of the district court, including its judgment in favor of the defendant on the issue of religious persecution, and remand the case with instructions to retain jurisdiction pending action by state authorities, and with the further proviso that either party may apply to the district court for further action at any time after one year from the date of this order.
 
 
 
 [1]
 As a recent note in the Harvard Law Review says:
 'The group cannot be classified as purely religious in nature: 'Although the Black Muslims call their Movement a religion, religious values are of secondary importance. They are not part of the Movement's basic appeal except to the extent that they foster and strengthen the sense of group solidarity.' (Lincoln, The Black Muslims in America 27 (1961).) The central doctrine of the movement is black supremacy and the equation of the white race with 'total evil.' (Worthy, The Angriest Negroes, Esquire, Feb. 1961, p. 102.) The Black Muslims' exact political aspirations are nebulous, although vague statements have been made concerning the establishment of a separate Black Muslim state in America, estimated to include from one to ten of the present states. How this territory is proposed to be acquired is a matter of mystery. There is within the movement an elite army, called the Fruit of Islam, whose activities have been shrouded in secrecy.' 75 Harv.L.Rev. 837, 838-9 (1962).
 
 
 [2]
 'It is true that prison administration ordinarily demands that rights to speech and assembly, guaranteed to members of free society by the first and fourteenth amendments, be sharply curtailed.' 75 Harv.L.Rev. 837, 839 (1962)
 
 
 [3]
 We do not consider Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961) to be at variance with the Pegelow case and the many cases supporting the proposition for which it is cited. This first Pierce case appeared on its face to be 'extreme,' since it was alleged that prisoners were being punished solely because of their religious beliefs. Actually the ultimate disposition of the case involved no interference by the court with prison discipline. Pierce v. LaVallee, 319 F.2d 844 (2d Cir.), cert. denied, 374 U.S. 850, 83 S.Ct. 1913, 10 L.Ed.2d 1070 (1963)
 
 
 [4]
 Elijah Muhammad has said:
 'The white or Caucasian European race is known to God and his prophets as Satan, the devil, the enemy of God and his people (the original nation) power was given to them to rule with evil and falsehood the darker nations for six thousand years. They have done and are now forty-six years overtime and they know this. It will take a few years to complete the separation. Nevertheless the work is going on now at a very good rate of speed.' 'The truth of the white race will make all black mankind hate them. The truth of the white race and kind will make all black mankind hate them regardless of their color; black, brown, yellow or red. The truth of the white race is a part of that secret which was withheld by Allah to allow them, the devils, to live their time, six thousand years.' 'If you understood it right you will agree with me that the whole Caucasian Race is a race of devils.'
 (The quotations are from the Supreme Wisdom containing 'the teachings' of the Honorable Elijah Muhammad. This work was an exhibit in the present case.)
 Malcolm X, at the time a 'minister' of the Muslims, said of an airplane accident in which more than 120 white people were killed:
 'Well, somebody came and told me that he really had answered our prayers over in France. He dropped an airplane out of the sky with over one hundred twenty white people on it, because the Muslims believe in an eye for an eye and a tooth for a tooth, but thanks to God or Jehovah or Allah we will continue to pray and we hope that every day another plane falls out of the sky.'
 
 
 [5]
 'Bratcher said in the presence of white officers and white inmates, to another colored inmate, 'This goddam Jesus Christ has got to go. He has served the purpose of the white man long enough." (Testimony of A. J. Meyer.)
 
 
 [6]
 'I received a report from a correction officer that there were certain inmates that were threatening the life of (one of the Muslims) because he had conversations with other inmates that pertained to such things as the subjugation of the * * * white race, and these inmates were threatening-- a correction officer reported to me that these inmates were so incensed * * * by this conversation that they were threatening the life of this particular inmate, and I asked him if he felt or sensed that this was the situation. He said he felt there was some danger.'
 Testimony of Albert J. Meyer at the trial in the present case.
 'Petitioner's racial preaching within the hearing of white and negro inmates was such as to be offensive, insulting, and disturbing to white inmates and to non-Muslim negroes and to engender those feelings which tend to menace order.' Fulwood v. Clemmer, 206 F.Supp. 370, 378 (D.D.C.1962).
 
 
 [7]
 For a copy of the Constitution of the Muslim Brotherhood see Pierce v. LaVallee, 212 F.Supp. 865, Appendix pp. 870-874 (N.D.N.Y.1962), aff'd, 319 F.2d 844 (2d Cir.), cert. denied, 374 U.S. 850, 83 S.Ct. 1913 (1963)
 
 
 [8]
 Testimony of Robert Arnold Boyd, at the trial of the present case
 
 
 [9]
 Comment, 62 Colum.L.Rev. 1488, 1492 (1962)
 
 
 [10]
 Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963), cert. denied, 376 U.S. 932, 84 S.Ct. 702 (1964)
 
 
 [11]
 610. Freedom of worship
 'All persons who may have been or may hereafter be committed to or taken charge of by any of the institutions mentioned in this section, are hereby declared to be and entitled to the free exercise and enjoyment of religious profession and worship, without discrimination or preference.
 'This section shall be deemed to apply to every incorporated or unincorporated society for the reformation of its inmates, as well as houses of refuge, penitentiaries, protectories, reformatories or other correctional institutions, continuing to receive for its use, either public moneys, or a per capita sum from any municipality for the support of inmates.
 'The rules and regulations established for the government of the institutions mentioned in this section shall recognize the right of the inmates to the free exercise of their religious belief, and to worship God according to the dictates of their consciences, in accordance with the provisions of the constitution; and shall allow religious services on Sunday and for private ministration to the inmates in such manner as may best carry into effect the spirit and intent of this section and be consistent with the proper discipline and management of the institution; and the inmates of such institutions shall be allowed such religious services and spiritual advice and spiritual ministration from some recognized clergyman of the denomination or church which said inmates may respectively prefer or to which they may have belonged prior to their being confined in such institutions; but if any of such inmates shall be minors under the age of sixteen years, then such services, advice and spiritual ministration shall be allowed in accordance with the methods and rites of the particular denomination or church which the parents or guardians of such minors may select; such services to be held and such advice and ministration to be given within the buildings or grounds where the inmates are required by law to be confined, in such manner and at such hours as will be in harmony, as aforesaid, with the discipline and the rules and regulations of the institution and secure to such inmates free exercise of their religious beliefs in accordance with the provisions of this section. In case of a violation of any of the provisions of this section any person feeling himself aggrieved thereby may institute proceedings in the supreme court of the district where such institution is situated, which is hereby authorized and empowered to enforce the provisions of this section.'