William B. Lawless, J.
Petitioners move pursuant to CPLB 3212 (suibd. [e]) for an order directing partial summary judgment in their favor, directing respondents forthwith to issue rules and regulations respecting the rights of petitioners and others .similarly .situate to practice the religion of Islam as members of the denomination or 'Sect headed by Elijah Muhammad (commonly known as “ Muslimism ”).
'They contend they are denied: (a) The right to correspond with a minister of their own faith and choosing, (b) the right to receive as a visitor and have consultations with a minister of their own faith and choosing for purposes of spiritual ministration, guidance and instruction, (c) the right to receive, possess, distribute and discuss religious literature, including a translation of the Quran (Koran), commonly used by members of their faith, (d) the right to hold congregational services at which a minister of their own faith and choosing will be allowed to preside in order to give spiritual ministration, guidance and instruction, and (e) the right to observe the dietary laws of their religion.
Petitioner Magette originally brought action in the United States District Court for the Western District of New York (William SaMarion and Thomas L. Bratcher v. McGinnis, and Joseph J. Walker, Joseph X. Magette and Arthur Johnson v. McGinnis and Wilkins). In the Federal court the actions were commenced pursuant to the Civil Bights Act (U. S. Code, tit. 28, § 1343; U. S. Code, tit. 42, § 1983) petitioners claiming that they have been and are .subject to religious persecution and discrimination at Attica Prison. After hearing extensive *925 proofs, including the history of this group, its philosophy, character and activities, the Federal District Court (Henderson, J.) held that the question of ¡balancing petitioners’ rights to practice their religion while in prison, as opposed to the State’s right to maintain prison discipline, should be initially determined by the courts of the State of New York rather than by the United States courts. The Federal court invoked the Federal rule of abstention but did, however, make a finding of fact that the petitioners are a religious, as opposed to a strictly social, political or fraternal organization and that the petitioners therein embraced its tenets.
The Federal Court of Appeals in a unanimous opinion by Hats, J., reversed the decision of the District Court and remanded the case with instructions to the District Court to retain jurisdiction pending action by State authorities (Sostre v. McGinnis, 334 F. 2d 906 [C. A. 2d, 1964]). However, the Court of Appeals accepted the finding of the District Court that the beliefs of the Black Muslims constitute a “ religion ” although the evidence in the record indicated that the activities of the group are not exclusively religious (Sostre, supra, pp. 907-908).
The questions presented on this motion for partial summary judgment are (1) whether there is a triable issue that the petitioners as Black Muslims belong to a “ religion ” entitled to exercise that religion within the meaning of Federal and State law, (2) whether in their present form the Commissioner’s rules and regulations concerning religious exercises in the prisons conform to Federal and State law.
Petitioners contend that under both Federal and State law, and by virtue of an affirmed finding of fact in the Federal courts in Sostre that the Black Muslims are a “ religious group ” which the Commissioner is required to recognize in issuing rules and regulations for religious exercises within the prisons of the State. The Commissioner contends that petitioners’ beliefs are a “ sham ” not entitled to recognition as a “religion” and declines to permit the religious practices of the Muslims on the ground that they are a group associated for the purpose of creating racial violence and other activities subversive to the proper conduct of prison discipline, and has prepared rules based on that assumption.»
Similar proceedings were instituted in Matter of Brown v. McGinnis (10 N Y 2d 531) wherein the Court of Appeals held that Brown, an inmate of Green Haven Prison, was entitled to a hearing at Special Term to determine his rights within the provision of section 610 of the Correction Law and such reasonable rules and regulations of the Commissioner of Correction *926 as are 1 ‘ consistent with the proper discipline and management of the institution ” (10 N Y 2d 531, 536). Chief Judge Desmond in a separate concurring opinion stated (pp. 536-537): “ I
concur with Judge Froessel’s careful and able opinion but out of caution I make this addition. I understand our reversal to mean that the Commissioner must promulgate forthwith (see Correction Law, § 112) the rules and regulations referred to in section 610 and that, subject to necessary security and disciplinary measures, he must extend to petitioner and his coreligionists all the rights guaranteed by section 610 ”. (Emphasis added.)
On June 29,1962, subsequent to the Court of Appeals decision in Brown v. McGinnis (supra) the Commissioner of Correction filed certain rules and regulations concerning religious services and ministrations. (See 7 NYCRR 59.1-59.9.) On January 23, 1964, a “ Statement of Policy ” was promulgated by the Department of Correction but was not accepted for publication by the Secretary of State as a rule or regulation.
On this motion, petitioners contend that the regulations adopted by the Commissioner of Correction do not comply with the court’s mandate in Brown v. McGinnis (supra) in that they constitute a prior restraint upon the Muslims’ free exercise of religion in violation of the First and Fourteenth Amendments to the Constitution of the United States and section 3 of article I of the Constitution of the State of New York.
The Commissioner’s answer to the petition admits that petitioners are followers of a sect headed by one known as Elijah Muhammad, denies that it is a “ religion ’ ’ and claims that the ‘ ‘ religious cult as invented ’ ’ is dedicated to hate and vengeance and the destruction of the Government of the United States of America. The answer states that the Commissioner and Wardens “ distinguish between the orthodox religion of Islam as proclaimed by Mohammad of Arabia in or about the year 622 A. D. and the religious cult of the said Poole, alias Elijah Muhammad.” Later in the answer the Commissioner flatly admits that he “ has refused to allow the said religion of Elijah Muhammad into the prisons of the State of New York in the exercise of his duty to preserve law and order.” (Emphasis added.)
I.
In deciding whether partial summary judgment is appropriate at this stage in the proceedings, we are required not only to determine whether a fact question is presented but also to examine the Commissioner’s answer in terms of his con *927 stitutional and statutory authority. At the threshold we recognize that although prisoners have an absolute right to their beliefs in the philosophical sense, in the exercise and practice of those beliefs, they are “ subject to extensive limitations which would not be applicable were [they] not prisoners.” (Sostre v. McGinnis, 334 F. 2d 906, 908, supra; Cantwell v. Connecticut, 310 U. S. 296, and Sewell v. Pegelow, 291 F. 2d 196.) In addition to their Federal rights, prisoners in New York are entitled to freedom of worship as a right protected by the State Constitution and defined in detail in the State Correction Law. That law permits prisoners ‘ ‘ the free exercise and enjoyment of religious profession and worship, without discrimination or preference ” provided that it “be consistent with the proper discipline and management of the institution ” (Correction Law, § 610).
However, these rights become ribbons if the Commissioner of Correction is permitted to restrict religious exercises to those sects which he judges worthy of recognition. As the United States Supreme Court said in United States v. Ballard (322 U. S. 78, 87): “ The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of connecting views. Man’s relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain. The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position. Murdock v. Pennsylvania, 319 U. S. 105.” (Emphasis added.)
The Supreme Court of the United States recently reaffirmed Ballard and again stated that Government officials are forbidden to reject beliefs because they consider them nonreligious. In United States v. Seeger (380 U. S. 163, 185), Mr. Justice Clark, writing for the court, stated: “ The validity of what he believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant’s ‘ Supreme Being ’ or the truth of his concepts. *928 But these are inquiries foreclosed to Government. [Citing Mr. Justice Douglas in United States v. Ballard; emphasis added.] ”
In refusing to recognize the Black Muslim group as a “ religion ”, the Commissioner has assumed powers beyond the scope of his legislative authority, he contradicts a finding of fact in this case (Sostre v. McGinnis, supra, pp. 907-908) and he denies free exercise of religion and equal protection of the law guaranteed by the United States Constitution (United States v. Seeger, supra; Fowler v. Rhode Island, 345 U. S. 67, 69; Niemotko v. Maryland, 340 U. S. 268, 272; United Stales v. Ballard, supra; Cantwell v. Connecticut, supra-, Banks v. Havener, 234 F. Supp. 27). (See, also, “Black Muslims in Prison: Muslim Rights & Constitutional Rights, Comment, 62 Col. L. Rev. 1488, 1489-1504 [1962].)
II.
The New York Commissioner of Correction has been vested by State law with broad powers to maintain the prison system throughout the State. Among these is the power to make such rules and regulations, not in conflict with the statutes of this State, for the government and discipline of each prison, as he may deem proper. (Correction Law, § 112.)
These general powers are, however, restricted where freedom of religion is concerned. The Correction Law (§ 610) expressly provides that all persons committed to the State prisons are entitled to the free exercise and enjoyment of religious profession and worship ‘1 without discrimination or preference ’ ’. Further, the Commissioner is expressly required to include in the rules and regulations the right of the immates to the free exercise of their religious belief, and to worship G-od according to the dictates of their consciences, in accordance with the provisions of the Constitution. The Commissioner is directed by statute to allow religious services and private ministration to the inmates in such manner as may best carry into effect the spirit and intent of the Correction Law and be consistent with the proper discipline and management of the institution concerned.
Section 610 provides that the inmates shall be allowed such religious services and spiritual advice and spiritual ministration from some recognized clergyman of the denomination or church which said inmates may respectively prefer or to which they may have belonged prior to their being confined in such institutions. Such services are to be held and such advice and ministration is to he given within the buildings or grounds *929 where the inmates are required by law to be confined, in such manner and at such hours as will be in harmony with the discipline and the rules and regulations of the institution and secure to such inmates free exercise of their religious beliefs.
In this case, the Commissioner’s regulations and statement of policy have been drafted on the unconstitutional assumption that the Commissioner has authority to determine that the Muslims are a “ sham ” and therefore are not entitled to any religious exercises. It is apparent that the effect of the regulations adopted to date is to prevent members of the Muslim religion from obtaining spiritual advice and ministration from ministers of their own faith and choosing and conducting the other religious exercises described in their petitions.
In part the rules of the Commissioner and his statement of policy provide opportunity for religious worship. Indeed, section 59.2 (7 NYCRR 59.2) states that each institution shall provide as liberal an opportunity as practicable for inmates to enjoy the administration of their own religious faiths, provided they comply with the proper discipline and management of the institution. However, section 59.4 restricts the visitation of inmates to certain clergymen of “ approved denominational faith * * * who possess the requisite qualifications ”. What is an “ approved ’ ’ faith and what are ‘ ‘ requisite qualifications ” are not spelled out. (Italics added.) Section 59.7 permits any “ recognised religious body ” to hold denominational services under supervision but no criteria is established for what is a “ recognized religious body ”. (Italics added.) Section 59.8 excludes “ non-qualified clergymen ”, that is, any person professing to be a clergyman who is not fully ordained by his ecclesiastical body and in good standing is not permitted to conduct denominational services or to provide inmates with spiritual advice. A visiting clergyman is made subject to the resident chaplain in section 59.9 and may conduct religious activities provided he pass “ a careful .scrutiny ” of his credentials and of his “ personal qualifications.” The 'Commissioner’s statement of policy (dated Jan. 23, 1964) states that a minister may visit a prisoner in a State prison when he is qualified to do so pursuant to the provisions of the Correction Law of the State of New York (presumably § 146 concerning visitors). It also permits correspondence with prisoners by an ordained priest or minister or rabbi or religious scholar of religions other than those comprising the major faiths when those particular individuals are “ qualified ” to correspond with prisoners pursuant to the Correction Law, yet the Correction Law is silent on such qualifications. As to visiting clergymen and *930 corresponding clergymen, the Commissioner requires in his statement of policy that the qualifications shall be that each shall be certified as an “ authentic member ” of his particular sect. He provides further that a clergyman of any approved denominational faith and in good standing who possessed the “qualifications” may be permitted to visit any inmate who was a member of his faith “ prior to Ms commitmentThis patently contradicts section 610 of the Correction Law, which allows spiritual ministration from recognized clergy of the church which the inmates ‘ ‘ may respectively prefer ’ ’. In acknowledging religions other than the traditional Hebrew and Christian faiths, the Commissioner recognizes the religion of Islam as that promulgated by Mohammed of Arabia but refuses “ to recognize ” the Black Muslim claim to Islamic derivation.
Freedom to select the clergy and to determine the essential qualifications of ministers and chaplains is an essential part of the free exercise of religion entitled to Federal constitutional protection against State interference. (Kedroff v. St. Nicholas Cathedral, 344 U. S. 95, 116.) Therefore, there is do authority for the Commissioner to fix arbitrary standards for clergymen who seek to visit inmates in our State prisons and provide religious guidance to them. We have searched the statutes of this State and find that at no time has our Legislature attempted to define “ clergyman ” to prescribe formal State requirements or State certification for such persons. Yet, the Commissioner’s regulations and statement of policy restrict the visitation and advice of an inmate to a “qualified” clergyman of an “ approved ” denominational faith. The purpose of these regulations is to preclude ministers or clergymen from visitation with inmates if they do not meet standards set by the Commissioner. As Judge Henderson observed: “ The rules and regulations as promulgated and interpreted by the Commissioner # * * are obviously little more than a list of ‘ qualifications ’ necessary for clergymen desiring to consult with inmates or preach in state penal institutions. However, these 1 qualifications ’ in effect bar all spiritual advisers of the plaintiff’s religious persuasion.” (SaMarion v. McGinnis, Civil No. 9395, W. D. N. Y., Oct., 1963; Sostre v. McGinnis, supra.)
It is a well-settled principle of constitutional law that individual liberties, although subject to legitimate limitations as a result of a greater common or public good, may not be infringed upon by unreasonable or unduly broad restrictions, especially when less drastic and sweeping means of achieving the objective are available and the end can be more narrowly achieved. (Aptheker v. Secretary of State, 378 U. S. 500, decided June *931 22,1964.) Since the regulations mentioned above sweep broadly to permit the exclusion of all Muslim inmates from the exercise of every religious service, they unduly infringe on the petitioners’ rights as guaranteed by the Federal and State Constitutions and the statutes of this State.
III.
Concededly, the Commissioner has an obligation to consider the security and proper discipline of prisons in drawing rules and regulations pursuant to the Correction Law (§§ 112, 610) and the mandate of the Court of Appeals in Brown v. McGinnis (10 N Y 2d 531, supra) and he must establish such rules and regulations which will, in fact, maintain the delicate balance between prison security and free exercise of religion. We realize that this is not an easy task and, while it is not within the province of the court to write these rules, we do suggest some guidelines to the Commissioner. The revised regulations of the Commissioner should indicate the time, the place and the conditions under which members of all religious sects (including the Black Muslims) will be permitted to hold congregational meetings in the prisons pursuant to section 610. If individuals of any sect have past records of prison misconduct, certainly the Commissioner and Wardens may take this into account in selecting the place for the services, the number of prisoners permitted to attend the services, the number of guards to be present, the exclusion of certain individuals from the participation in the services and other details fully within their discretion. Regulations incorporating these or similar restrictions, since they control rather than subvert the rights of prisoners, are certainly within the discretion of the Commissioner in his legitimate efforts to maintain proper prison discipline.
Should any religious exercise disturb the peace of the prison, individuals causing and willfully participating therein may be subjected to appropriate disciplinary action by the Commissioner and his Wardens without reference to their religious affiliation. Further, if the exercise of any particular religion, as opposed to the actions of individual members of a sect, is shown by convincing evidence to pose a clear and present danger to proper discipline and management of the prison, then those exercises and practices may be prohibited by order of the Commissioner so long as the danger, in fact, exists. As Judge Lewis pointed out in Banks v. Havener (234 F. Supp. 27, 30): “ Muslim belief in black supremacy, standing alone is not sufficient to justify the suppression of religious freedom in the Youth *932 Center; neither is the alleged disruptive effect on the rehabilitation program. (There was little, if any, substantive evidence to support his allegation.) To justify the prohibition of the practice of an established religion at the Youth Center the prison officials must prove by satisfactory evidence that the teachings and practice of the sect create a clear and present danger to the orderly functioning of the institution. This they have not done.”
For the reasons indicated, the Commissioner is directed forthwith to prepare and promulgate, in accordance with this opinion, revised regulations consistent with the Federal and State Constitutions and the spirit and intent of section 610 of the Correction Law.
Motion for partial summary judgment is granted.