**Willis X. BRYANT, Lionel X. Jones, and Arthur Johnson, Plaintiffs,**

v.

**Paul McGINNIS, Defendant.**

Civ. Nos. 9395, 11569.

United States District Court, W. D. New York.

Nov. 22, 1978.

**374**

Paul I. Birzon and Cheryl S. Fisher, Buffalo, N. Y., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City (John R. Stewart, Asst. Atty. Gen., Albany, N. Y., of counsel), for defendant.

CURTIN, Chief Judge.

With the damages trial of this matter, held on May 2, 1978, the long and tortuous path of this litigation wends closer to a final resolution.

### PROCEDURAL BACKGROUND

This action was begun nearly seventeen years ago on October 10, 1961, when William SaMarion filed with this court a handwritten, *pro se* civil rights complaint under 42 U.S.C. § 1983 in which he alleged that he and other inmates of the Attica State Prison were being denied the right to embrace and practice the Religion of Islam as members of the Muslim sect led by the Honorable Elijah Muhammad.

Shortly thereafter, the New York State Court of Appeals decided *Brown v. McGinnis,* 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791, on January 25, 1962. *Brown v. McGinnis* was a mandamus action in which the petitioner, a member of the Islamic faith, sought to be allowed to receive spiritual advice, ministration, and religious services from the local temple of Islam that was located in New York City and headed by Malcolm X. The Court of Appeals reversed the lower courts, which had denied the petitioner's application without a hearing, and remitted the action to the trial court. Subsequently, the proceeding was dismissed when the petitioner was released from custody.

Significantly, Chief Judge Charles S. Desmond stated in a concurring opinion:

I understand our reversal to mean that the Commissioner must promulgate forthwith (see Correction Law, § 112) the rules and regulations referred to in section 610 [of the Correction Law] and that, subject to necessary security and disciplinary measures, he must extend to petitioner and his coreligionists all the rights guaranteed by section 610.

*Brown v. McGinnis,* 10 N.Y.2d at 536–537, 225 N.Y.S.2d at 501, 180 N.E.2d at 793.

In October 1962, a trial was held in this court on plaintiff SaMarion's request for injunctive relief. At that trial, plaintiffs offered the testimony of several ministers of the Religion of Islam, including that of the late Malcolm X. Among the individual plaintiffs who testified at that trial was Arthur Johnson, who also testified before me on May 2, 1978. In addition to the testimony of their own expert on the Islamic faith, defendants offered their own testimony and that of several corrections guards.

On October 14, 1963, the Honorable John O. Henderson, who had presided at the trial, found that the Muslim faith is a religion and that the named plaintiffs had embraced its tenets. Judge Henderson interpreted the decision in *Brown v. McGinnis, supra,* to extend to Muslim inmates the rights secured by § 610 of the Corrections Law.[1] *SaMarion v. McGinnis,* Civ. 9395, slip op. at 10 (W.D.N.Y. Oct. 14, 1963). Judge Henderson recognized that the rules and regulations promulgated on June 28, 1962[2] were, as interpreted by Commissioner McGinnis,

---

1. Former § 610 of the Corrections Law provided:

All persons who may have been or may hereafter be committed to or taken charge of by any of the institutions mentioned in this section, are hereby declared to be and entitled to the free exercise and enjoyment of religious profession and worship, without discrimination or preference.

This section shall be deemed to apply to every incorporated or unincorporated society for the reformation of its inmates, as well as houses of refuge, penitentiaries, protectories, reformatories or other correctional institutions, continuing to receive for its use, either public moneys, or a per capita sum from any municipality for the support of inmates.

The rules and regulations established for the government of the institutions mentioned in this section shall recognize the right of the inmates to the free exercise of their religious belief, and to worship God according to the dictates of their consciences, in accordance with the provisions of the constitution; and shall allow religious services on Sunday and for private ministration to the inmates in such manner as may best carry into effect the spirit and intent of this section and be consistent with the proper discipline and management of the institution; and the inmates of such institutions shall be allowed such religious services and spiritual advice and spiritual ministration from some recognized clergyman of the denomination or church which said inmates may respectively prefer or to which they may have belonged prior to their being confined in such institutions; but if any of such inmates shall be minors under the age of sixteen years, then such services, advice and spiritual ministration shall be allowed in accordance with the methods and rites of the particular denomination or church which the parents or guardians of such minors may select; such services to be held and such advice and ministration to be given within the buildings or grounds where the inmates are required by law to be confined, in such manner and at such hours as will be in harmony, as aforesaid, with the discipline and the rules and regulations of the institution and secure to such inmates free exercise of their religious beliefs in accordance with the provisions of this section. In case of a violation of any·of the provisions of this section any person feeling himself aggrieved thereby may institute proceedings in the supreme court of the district where such institution is situated, which is hereby authorized and empowered to enforce the provisions of this section.

2. The Rules and Regulations promulgated on June 28, 1962 are as follows:

### RULES ON RELIGIOUS SERVICES IN CORRECTIONAL INSTITUTIONS

The following rules pertaining to religious services and ministrations in correctional institutions under the jurisdiction of the New York State Department of Correction are hereby promulgated by the Commissioner of Correction as authorized by Section 112 of the Correction Law. These rules have been prepared in conformity with Section 610 of the Correction Law which provides that the Department of Correction shall recognize the right of the inmates to the free exercise of their religious belief and to worship God according to the dictates of their consciences in accordance with the provisions of the Constitution and consistent with the proper discipline and management of the institutions.

obviously little more than a list of "qualifications" necessary for clergymen desiring to consult with inmates or preach in state penal institutions. However, these "qualifications" in effect bar all spiritual advisers of the plaintiffs' religious persuasion.

*SaMarion v. McGinnis, supra* at 8.

However, Judge Henderson then ruled against plaintiffs on their claims that they had been subjected to religious persecution and entered judgment for the defendants.

He dismissed plaintiffs' remaining claims, invoking the federal rule of abstention, so that the New York state courts could have an opportunity to define the nature of plaintiffs' rights to practice their religion within a penal institution.

While accepting Judge Henderson's finding that Muslimism was a religion, the Second Circuit Court of Appeals then reversed Judge Henderson's decision and remanded the case with instructions to the district court to retain jurisdiction pending action by state authorities, with the addi-

1. All resident and visiting chaplains shall possess the following qualifications:
   A. Each chaplain must be fully ordained by his ecclesiastical body and in good standing. He shall receive ecclesiastical endorsement from his religious authority, such as the approval by a Bishop of the Roman Catholic Church, or New York Board of Rabbis, or an authorized denominational agency, as the case may be.
   B. A candidate for the chaplaincy must have served a minimum of five years of successful parish ministry as pastor, priest, rabbi, administrator, assistant, or its equivalent in full time service.
   C. The academic education of a chaplain must include both of the following:
   The degree of A.B. or B.S., or its equivalent, from a four year accredited college or university, as approved by the Board of Regents of the State of New York, or the American Association of Colleges and Universities.
   The degree of B.D. or S.T.B., or the equivalent from a three year Seminary.
2. Each institution shall provide as liberal an opportunity as practicable for inmates to enjoy the ministrations of their own religious faiths in such manner and at such times and occasions as may be appropriate to their denominational requirements and the restrictions concomitant with incarceration and the proper discipline and management of the institution.
3. Since there are a great number of recognized religious denominations and it is not possible to provide a clergyman for each, both because of the facilities available and budgetary limitations, the chaplains of the three major faiths shall provide or arrange for worshipping and counselling at regular periods set aside for these purposes.
4. Clergymen of any approved denominational faith and in good standing thereof who possess the requisite qualifications, may be permitted to visit any inmate who was a member of his faith prior to his commitment with the consent of the Head of the institution and under the supervision of one of the resident chaplains.
5. Such clergyman may be permitted to give spiritual advice and ministrations if the inmate so desires, but such assistance shall be under the supervision of and arranged by one of the resident chaplains and in accordance with the rules and regulations pertaining to religious activities.
6. A guest clergyman, who has received ecclesiastical endorsement from his religious authority or recognized denominational agency and who possesses the requisite qualifications herein, may be permitted to officiate at religious services for a duly recognized denominational group and may render spiritual advice and ministrations to members of such religious faith in accordance with regulations pertaining to religious activities with the consent of the institutional Head but such services shall be performed under the supervision of one of the resident chaplains.
7. Any recognized religious body upon petition to and approval by the institutional Head, may be permitted to hold and officiate at special denominational services in any correctional institution, under the supervision of one of the resident chaplains.
8. Any person professing to be clergyman, who is not fully ordained by his ecclesiastical body and in good standing thereof, shall not be permitted to officiate at any denominational service or to provide inmates with spiritual advice or ministrations.
9. In all instances where permission is granted by the Head of the institution to visiting auxiliaries, such ministry shall be accomplished under the supervision of one of the resident chaplains in harmony with the regulations relating to religious activities, which will include a careful scrutiny of the credentials of such auxiliary to conduct religious services and his personal qualifications.

The foregoing rules are to take effect immediately.

/s/ Paul D. McGinnis
Paul D. McGinnis
Commissioner of Correction
June 28, 1962

tional proviso that either party might apply to the district court for further action at any time after one year from the date of that order. *Sostre v. McGinnis,* 334 F.2d 906 (2d Cir. 1964), cert. denied 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96.

In the course of rendering its decision, the court observed:

> The problem presented by the Muslim group is not whether they should be permitted to have congregational services, a minister, religious literature, but rather, under what limitations protective of prison discipline they should be permitted these rights.
>
> It is of little use for us to announce that because of the religious content of the Muslims' beliefs and practices they must be given the right, even in prison, to follow the dictates of their faith, if we find it necessary immediately to add, "Of course all these rights are subject to such reasonable rules and regulations as the authorities impose."
>
> In other words the nub of this whole situation is not to be found in the existence of theoretical rights, but in the very practical limitations on those rights which are made necessary by the requirements of prison discipline.
>
> It is not the business of the Federal Courts to work out a set of rules and regulations to govern the practices of religion in the state prisons. Surely this is a task for the state authorities to undertake. We do not stop with an empty declaration of rights accompanied by generalities as to proper limitations on those rights. We prefer, having given expression to the requirement that insofar as possible within the limits of prison discipline the Muslims be allowed what they ask for, not to leave it at that, but to request that the state authorities propose the rules and regulations which they believe are necessary.

Id. at 911–912.

As Judge Henderson had acknowledged, state court actions, addressing the same issues as were before this court, were pending at that time. Joseph X. Magette, who was also a plaintiff in this action for a time, had filed a petition under Article 78 of the New York Civil Practice Act with the Supreme Court, Wyoming County, in April 1962, in which he indicated that he was a Muslim who was seeking to be accorded the guarantees of § 610 of the Corrections Law. Similar petitions were submitted to the Supreme Court, Erie County, by Willis X. Bryant, Jr., who remains as a named plaintiff in the action before me, and by a George X. Jones, in August or September 1963.

On March 29, 1965, the Honorable William B. Lawless granted plaintiffs' motion for partial summary judgment and found that the 1962 Regulations "sweep broadly to permit the exclusion of all Muslim inmates from the exercise of every religious service." *Bryant v. Wilkins,* 45 Misc.2d 923, 258 N.Y.S.2d 455, 463 (Sup.Ct. Wyoming Co.1965).

Justice Lawless noted that Commissioner McGinnis continued to deny that Muslimism was a "religion" and he held that

> [i]n refusing to recognize the Black Muslim group as a "religion", the Commissioner has assumed powers beyond the scope of his legislative authority, he contradicts a finding of fact in this case (*Sostre v. McGinnis,* supra, 334 F.2d 907–908) and he denies free exercise of religion and equal protection of the law guaranteed by the United States Constitution [citations omitted].

Id. 258 N.Y.S.2d at 460.

In finding that the 1962 Regulations patently contradicted § 610 of the Correction Law, Justice Lawless echoed Judge Henderson's opinion that the purpose of those regulations was merely to preclude Muslim ministers from New York State's prisons:

> It is apparent that the effect of the regulations adopted to date is to prevent members of the Muslim religion from obtaining spiritual advice and ministration from ministers of their own faith and choosing and conducting the other religious exercises described in their petition.

Id. at 461. He directed the Commissioner of Correction to promulgate revised regulations consistent with federal and state constitutions, and § 610 of the Corrections Law, that would allow plaintiffs to practice the religion of Islam as members of the Muslim sect.

The Appellate Division then reversed Justice Lawless' decision. The Appellate Division found that there was no triable issue as to whether or not the Muslim faith constituted a "religion" but that court found that a factual issue did exist with respect to whether or not maintenance of proper security and discipline within the penal institutions would require circumscription by rules and regulations of some Muslim religious practices. In that decision the court recognized that appellants, who included the defendant in the action presently before me, had conceded that under the rules and regulations promulgated by the Commissioner on June 29, 1962, as supplemented by the "Statement of Policy" of January 23, 1964,[3] plaintiffs would find it difficult if not

**3.** This "Statement of Policy", which was never accepted by the Secretary of State as a rule or regulation, reads:

In conformity with the mandate handed down by the Court of Appeals in the case of *Brown v. McGinnis,* 10 N.Y.2d [531, 225 N.Y. S.2d 497] and the enlargement and clarification of the rules and regulations relating to religious services in correctional institutions prepared by the Commissioner of Correction of the State of New York pursuant to said directive contained in said decision hereinbefore referred to, said rules and regulations were promulgated under date of June 28, 1962 and filed in the office of the Secretary of State on June 29, 1962. The Department of Correction through the Commissioner of Correction makes the following statement of policy.

1. That any and all State prisoners confined in State prison institutions in the State of New York under the jurisdiction and control of the Department of Correction of the State of New York shall have the right to religious beliefs and to religious worship according to the dictates of their conscience and in conformity with the discipline of the particular religion to which they claim adherence subject only to the necessary security and disciplinary measures required to be exercised in New York State prison institutions. While it is obvious that no one individual or individuals may set forth all various marks by which a religion may be recognized as such, the Commissioner of Correction recognizes that at least four basic elements can be discovered in any particular religious sect or group.

1. Study as a means to improve one's knowledge of a Supreme Being and of the particular religious sect involved;

2. Profession of that religion as a way of personal salvation;

3. Practice consisting of various sets of prayers and religious observances which an adherent should perform with regularity; and

4. Public or congregational religious worship by which the members of a particular religious sect come together and worship in a public manner.

The Commissioner also recognizes that there are varying religions in the world and no attempt will be made herein to name each of the various religions and no attempt will be made herein to define what sort of beliefs or practices or combination of both may be regarded or classified as a religion. The Commissioner reiterates and expresses again his understanding that under the First Amendment and the Fourteenth Amendment of the Constitution of the United States of America and pursuant to Article one Section 3 of the Constitution of the State of New York and Section 610 of the Correction Law of the State of New York, prisoners confined in the various State prisons under the jurisdiction of the Department of Correction of the State of New York are entitled to the free exercise of their religious beliefs and to worship God in accordance with the dictates of their consciences consistent always with proper discipline and management of the said State institutions. The Commissioner recognizes that the right to practice religion does not mean that acts inimical to the peace, good order and morals of Society, as determined by the Legislature of the State of New York, the Congress of the United States and the State courts of the State of New York and the federal courts of the United States of America in such areas as these various named governmental agencies may have jurisdiction, may be permitted in a State penal institution on the ground that such practices are sought to be performed in the name of religion or religious worship. The Commissioner makes these rules and regulations in accordance with his understanding of the decisions of the United States Supreme Court and the State of New York, holding in effect that freedom of religion is absolute only as long as public morals, public health and public safety are observed. The Commissioner understands that freedom of religion embraces the concept of freedom to believe and freedom to act, the first of which is absolute but the second of which remains subject to regulation for the protection of Society and that the government has the right and obligation to restrict any religious practice which either contravenes existing law or is detrimental to the

common good of Society. The Commissioner recognizes that he has the duty and obligation to maintain law and order and proper discipline in the various prisons of the State of New York and that in accordance with such duty he must exclude from the prison system any practices performed in the name of religion upon a finding by him that such religious practices create a clear and present danger to a particular prison or to the prison system. In this respect the Commissioner accepts and promulgates as a condition to support a finding of clear and present danger that the particular religious practice or religious doctrine would create an immediate serious danger of violence or that the past conduct of said religious practices or advocacy of said religious doctrines would give the Commissioner reason to believe that immediate serious violence could and would arise from advocacy within the prison of said religious doctrines or the carrying out thereof as religious practices with the State prison institutions.

The State of New York pursuant to law places upon its payroll and retains at salaries and State expense chaplains in State prison institutions as follows: A Protestant chaplain is retained and paid a salary by the State of New York to minister religiously to all the various and varying Protestant faiths. A Catholic chaplain is placed upon the payroll and paid a salary in each prison institution to minister to and give religious solace to the Roman Catholic inmates and the Greek Orthodox inmates. A Jewish rabbi is retained and paid a salary by the State of New York to offer and bring religious solace and ministration to the Jewish inmates. The Chaplains who are retained and salaried by the State of New York to serve in the various State prison institutions shall have the following qualifications:

A. Each chaplain must be fully ordained by his ecclesiastical body and in good standing. He shall receive ecclesiastical endorsement from his religious authority, such as the approval by a Bishop of the Roman Catholic Church, or New York Board of Rabbis, or an authorized denominational agency, as the case may be.

B. A candidate for the chaplaincy must have served a minimum of five years of successful *parish* ministry as pastor, priest, rabbi, administrator, assistant, or its equivalent in full time service.

C. The academic education of a chaplain must include both of the following:

The degree of A.B. or B.S., or its equivalent, from a four year accredited college or university, as approved by the Board of Regents of the State of New York, or the American Association of Colleges and Universities.

The degree of B.D. or S.T.B., or the equivalent from a three year Seminary.

In addition to the regularly paid chaplains, the Commissioner will permit a minister, priest or rabbi or other ordained cleric or religious scholar to visit a prisoner in a State prison institution when he is qualified to do so pursuant to the provisions of the Correction Law of the State of New York. The Commissioner of Correction will also permit correspondence with prisoners by a duly ordained or enrobed priest or minister of religion or Jewish rabbi or religious scholar of religions other than those comprising the Protestant, Catholic Greek Orthodox and Jewish religions when these particular individuals are qualified to so correspond with prisoners pursuant to the Correction Law of the State of New York. As to visiting clergymen and corresponding clergymen the qualifications shall be that each shall be certified as an authentic member of his particular sect or assigned by his particular superior in whatever diocese he may be serving.

2. Each institution shall provide as liberal an opportunity as practicable for inmates to enjoy the ministrations of their own religious faiths in such manner and at such times and occasions as may be appropriate to their denominational requirements and the restrictions concomitant with incarceration and the proper discipline and management of the institution.

3. Since there are a great number of recognized religious denominations and it is not possible to provide a clergyman for each, both because of the facilities available and budgetary limitations, the chaplains of the three major faiths shall provide or arrange for worshipping and counselling at regular periods set aside for these purposes.

4. Clergymen of any approved denominational faith and in good standing thereof who possess the requisite qualifications, may be permitted to visit any inmate who was a member of his faith prior to his commitment with the consent of the Head of the institution and under the supervision of one of the resident chaplains.

5. Such clergyman may be permitted to give spiritual advice and ministrations if the inmate so desires, but such assistance shall be under the supervision of and arranged by one of the resident chaplains and in accordance with the rules and regulations pertaining to religious activities.

6. A guest clergyman, who has received ecclesiastical endorsement from his religious authority or recognized denominational agency and who possesses the requisite qualifications herein, may be permitted to officiate at religious services for a duly recognized denomination group and may render spiritual advice and ministrations to members of such religious faith in accordance with regulations pertaining to religious activities with the consent of the institutional Head but such services shall be performed under the supervision of one of the resident chaplains.

7. Any recognized religious body upon petition to and approval by the institutional Head,

impossible to practice their religion in New York State prisons. *Bryant v. Wilkins,* 24 A.D.2d 1077, 265 N.Y.S.2d 995 (4th Dept. 1965).

After this reversal by the Appellate Division, plaintiffs then moved their cases in this court claiming unreasonable delay by state officials. Pursuant to the Second Circuit's decision in *Sostre v. McGinnis, supra,* Judge Henderson had stayed the actions here in the belief that constructive state action was imminent. Upon plaintiffs' motion in this court in March 1966, Judge Henderson found unreasonable delay by the Commissioner in promulgating new regulations:

> In the court's view, the defendants' approach to the problems involved has and is effectively preventing any reasonably expeditious action by this court or any state court.

*SaMarion v. McGinnis,* 253 F.Supp. 738, 740 (W.D.N.Y.1966).

Judge Henderson supported this conclusion with a reference to Commissioner McGinnis' affidavit filed with the court on March 29, 1966. At page 5 of his affidavit, Commissioner McGinnis had stated:

> In the judgment of your deponent, the State should have a trial in State Court *so a record may be made upon which rules and regulations relating to the admission of Black Muslimism into the State Prison System can be prepared.* On such a hearing or trial, the State is prepared to produce evidence by various personnel of the State Prison System closely associated with the problem of Black Muslimism which will show the dangerous, treasonable, anarchistic and subversive nature of the religion. The State will also produce witnesses from other states, highly placed in the administration of their respective State Penal Systems, to testify as to the dangerous nature of this religion. *After such a hearing or trial, a record or background can be produced upon which rules may be made concerning the practice of Black Muslimism.* However, in the opinion of your deponent, rules and regulations permitting congregational services and visitations and preachments by Black Muslim ministers, irrespective of what restrictions there may be, will result inevitably in riots, bloodshed, death and destruction of State prison property on a scale never before experienced in the history of the State of New York.

[Emphasis added].

After citing this portion of the affidavit, Judge Henderson then noted:

> This, of course, is an admission that the state officials have yet to promulgate rules and regulations addressed to the

---

may be permitted to hold and officiate at special denominational services in any correctional institution, under the supervision of one of the resident chaplains.

8. Any person professing to be a clergyman, who is not fully ordained by his ecclesiastical body and in good standing thereof, shall not be permitted to officiate at any denominational service or to provide inmates with spiritual advice or ministrations.

9. In all instances where permission is granted by the head of the institution to visiting auxiliaries, such ministry shall be accomplished under the supervision of one of the resident chaplains in harmony with the regulations relating to religious activities, which will include a careful scrutiny of the credentials of such auxiliary to conduct religious services and his personal qualifications.

It is recognized that there are other religions than the various Christian religions and the

Hebrew religion among which is the religion of Islam as promulgated by Mohammed of Arabia in or about the year 622 A.D. The said religion of Islam comprises the following sects or groups within said religion; the Sunni group, Ahmadiyya group and the Shiah group, which in the United States of America constitute the only groups of the religion of Islam as prepared by Mohammed of Arabia.

The Commissioner of Corrections shall make rules and regulations applicable to each prison for the orderly practice of the various religions and where he has made a determination that a particular claimed religion by past conduct or by advocacy of dangerous propositions which would hazard the peace and security of State penal institutions, he shall by edict circumscribe the practice of said religion and the advocacy of said religious doctrine to such an extent as to prevent the destruction of prison discipline and to continue the peace and security of the said penal institution.

practice of religion by the Black Muslims in the prison system.

Id.[4]

Judge Henderson then concluded that the 1962 Regulations had the effect of suppressing plaintiffs in their efforts to practice the

4. It should also be noted that Commissioner McGinnis' affidavit totally ignores the fact that an extensive trial had already been held in this court in October 1962.

5. These regulations were dated May 2, 1966, and provided:

(1) The following rules and regulations are promulgated by the Commissioner of Correction, together with the restrictions promulgated in connection therewith:

(2) The wardens of the various prisons within the jurisdiction of the Department of Correction of the State of New York are directed to hereby and forthwith provide opportunity and place for religious services for the persons professing the religion of Black Muslimism.

(3) The said wardens shall admit to the prison for the purpose of conducting services a Black Muslim minister or clergyman having the authorization to so act by the ecclesiastical head of their religious organization being one Elijah Muhammad of Chicago, Illinois, U. S. A. The said Black Muslims shall have the right to purchase a religious book known as the "Koran" and said Black Muslims shall have the right to receive religious literature.

(4) The religion of the Black Muslims will be restricted in the following manner for one year:

(5) No prison inmate may attend Muslim services who is not presently affiliated with the religious group known as Black Muslims.

(6) The Warden of Attica Prison and all of the wardens or superintendents of the various prisons within the jurisdiction of the Department of Correction of the State of New York are directed to hereby and forthwith provide opportunity and place for religious services for the persons *professing the religion of Black Muslimism.*

(7) The said Warden of Attica Prison and all of the wardens or superintendents of the various prisons within the jurisdiction of the Department of Correction of the State of New York shall admit to the prison for the purpose of conducting services a Black Muslim minister or clergyman having the authorization to so act by the ecclesiastical head of their religious organization being one Elijah Muhammad of Chicago, Illinois.

(8) The said Black Muslims shall have the right to purchase a religious book of the religion of Islam known as the "Koran" and said Black Muslims shall have the right to receive religious literature.

(9) Muslim services will be conducted for those inmates who prefer to be members of the Black Muslim religion.

religion of Islam. He directed the Commissioner to promulgate, implement and file with the Clerk of this court a set of rules and regulations to govern plaintiffs in the practice of their religion. *Id.* at 741. These Rules and Regulations were filed with this court on May 6, 1966.[5]

(10) No special diet for religious observance shall be offered to the Black Muslims since no such diet is offered to Protestants, Catholics or Jews, but said Black Muslims shall have the right to abstain from eating any food forbidden by their religious precepts and which is recognized as part of the discipline of their religion, but said Muslims may substitute such other food available at the particular meal.

(11) Religious services shall only be permitted on a day and place within the institution designated by the warden, which is convenient to the operation and administration of the prison and consistent with the safety and security of the institution.

(12) The newspaper "Muhammad Speaks" will be excluded, as well as any other newspapers or periodicals which are recognized by the warden as being inflammatory and dangerous to the safety and security of the institution.

(13) The said ministers of the said Black Muslims will not be permitted to preach criminal anarchy, as defined by § 160 of the Penal Law of the State of New York, or treason against the United States of America, or subversion of the United States of America, and such minister shall be so informed by the warden upon his reception at the prison as a minister. Violation of this regulation will permit the warden to stop the religious service and shall terminate the said service. The said service shall be monitored by institutional personnel so designated by the warden, to insure the safety and security of the institution.

(14) No demonstration of an unusual or inflammatory nature such as posturizing or such conduct as may arouse the passions of other inmates shall be permitted in the general population by the Black Muslims.

(15) Literature prepared by the Black Muslims which is inflammatory, anarchistic, treasonable or subversive shall be considered as contraband and subject to seizure and confiscation by the prison officials.

(16) Upon a showing by the Black Muslims and their ministers that they can conform to prison discipline, and that they can conduct services in a proper spiritual manner, without endangering the safety and security of the institution, these rules are subject to change at the discretion of the Commissioner of Correction.

(17) Since certain Muslim ministers have been known to have criminal records including the leader thereof, Elijah Muhammad, as an additional precautionary measure to insure the

It is important to note at this point that, after these Rules and Regulations were filed with the court, Judge Henderson recognized in two separate opinions that:

> The rules and regulations which now have been filed with the clerk and are presently in effect throughout the state prison system are viewed as evidence of a good-faith effort by prison officials to comply with the order of this court and with the spirit of the decision of the Circuit Court of Appeals in *Sostre v. McGinnis*, 334 F.2d 906 (2d Cir. 1964).

*In the Matter of the Application of Abu Jimmy X. Scott*, Civ. 9395, slip op. at 2–3 (W.D.N.Y. Oct. 19, 1966); *In the Matter of the Applications of Freddie X. Youngblood, et al.*, Civ. 9395, slip op. at 3 (W.D.N.Y. Sept. 20, 1966).

Subsequently, these 1966 Rules and Regulations were the subject of a hearing in New York State Supreme Court before Justice Lawless on the question of their reasonableness. Following the hearing, the Commissioner was directed to redraft the rules and regulations. *SaMarion v. McGinnis*, 55 Misc.2d 59, 284 N.Y.S.2d 504 (Sup.Ct. Erie Co. 1967). These revised Rules and Regulations [6] were then approved by Justice Lawless in an unreported Memorandum Decision of April 19, 1968, and by order of

safety and security of the prison, each Muslim minister applicant seeking admission as such to a penal institution under the jurisdiction of the Department of Correction shall submit to fingerprinting by the institutional authorities. A Black Muslim minister who is known to have a criminal record shall be denied admission to any institution in the Department of Correction.

(18) No Black Muslim inmate shall conduct services in the place of a Muslim minister.

(19) An appropriate meeting place of worship shall be designated in each prison for holding religious services, and no services may be held outside of such designated place.

(20) No special insignia, regalia or method of dress, or presentation of the person shall be permitted to the Black Muslims.

(21) The warden may limit the number of inmates who shall attend religious services at one time, as may be reasonably necessary and practically accommodated so as to insure the safety and security of the prison.

All of which is respectfully submitted.

> PAUL D. McGINNIS
> Commissioner of Correction
> State of New York

May 2, 1966

6. These Rules and Regulations were dated November 16, 1967, and provided:

> Pursuant to the decision in *Sostre v. McGinnis*, 334 F.2d 906, as implemented by the decision in *SaMarion et al. v. McGinnis*, 253 F.Supp. 738, and pursuant to the decision of the New York State Supreme Court, Special Term, dated October 2, 1967, the following rules and regulations are promulgated, which rules and regulations relate to the practice of Muslimism in Attica State Prison and all other penal institutions under the jurisdiction of the Department of Correction of the State of New York:
>
> 1. The Muslims shall have each and every religious right and privilege extended to Catholics, Protestants and Jews in the exercise of their respective religions.
>
> 2. Muslims may have a diet which does not contain prohibitive food substances but this is subject to modification by reason of reasonable regulations relating to the food problem of the entire prison population. The Muslims may substitute any food which is on the prison menu in place of a prohibitive food.
>
> 3. Prison inmates who desire to learn about the religious practice of the Muslim sect may attend religious services with the Muslims at the time and place to be appointed by the Warden, subject only to reasonable restrictions as to space and prison security.
>
> 4. Muslim ministers may attend at the prison for the purpose of preaching to the Muslims in congregational services and for the purpose of individual religious administration to the Muslims with the same rights and privileges extended to other ministers, priests or rabbis except that no form of compensation will be offered or paid to the Muslim ministers for such attendance at the prison.
>
> 5. Fingerprinting of each Muslim minister attending at the prison shall be required and will be also required of all clergymen visiting the prison, whether regularly on the payroll of the State of New York or attending as visiting clergymen.
>
> 6. Muslims may subscribe to any publication to which they may wish to subscribe but such publication shall be subject to censorship by the Warden, including the exclusion of said publication if in the reasonable opinion of the Warden the publication represents a threat to the security of the penal institution.
>
> 7. The Muslim ministers may wear such robe or religious raiment as they may desire and the Muslim inmates may wear such religious insignia which, in the reasonable opinion of the Warden, will not incite to prison disturbance in the inmate population.

Justice Carlton A. Fisher dated September 3, 1968.

On appeal, the Appellate Division then redrafted the rules, which it directed the Commissioner to approve.[7] The Appellate Division also concluded that it was an invidious, if not unconstitutional, discrimination for the Commissioner to promulgate for one religious sect specific rules and regulations which only reiterate standards applicable to all other inmates of New York State correctional institutions. *SaMarion v. McGinnis,* 35 A.D.2d 684, 314 N.Y.S.2d 715 (4th Dept. 1970).

In the meantime, plaintiffs had filed their claims for money damages with this court.[8]

A period of inactivity followed the 1970 decision of the Appellate Division. These cases came onto my calendar after Judge Henderson's death in February 1974. This dormant litigation was resuscitated in May 1976 and preparations were made for a trial on plaintiffs' claims for money damages. After two more years of discovery and preparation, the trial was finally held on May 2, 1978, before me.

At the time of trial, only three plaintiffs, Willis X. Bryant, Lionel X. Jones, and Arthur Johnson, remained in the lawsuit. Proof at trial consisted of these plaintiffs' testimony and the records of their incarceration which have been maintained by the New York State Department of Correctional Services and the New York State Parole Board.

Defendant Paul D. McGinnis, who retired as Commissioner of Correction on December 17, 1970, did not appear or otherwise offer testimony at the trial.

Plaintiffs' testimony can be briefly summarized.

Each plaintiff testified that he became a convert to the Muslim faith either shortly before or shortly after he had arrived at the Attica State Prison in the early 1960s. Each stated that from the time of his conversion until 1970 or 1971 he was not allowed to practice the Muslim faith openly within Attica: they were not allowed to participate in religious services; their requests to use the chapel were systematically rejected by the authorities; their attempts to hold services in the prison yard were banned; they were not allowed access to Muslim ministers; the Koran, the Muslims' holy book, was considered to be contraband

7. These revised Rules provide:

1. The Muslims shall have each and every religious right and privilege extended to Catholics, Protestants, and Jews in the exercise of their respective religions. Ministers, priests, or rabbis of all these stated religious faiths may attend at the prison for the purpose of preaching to the inmates in congregational services and for the purpose of individual religious ministration to the inmates.

2. Fingerprinting of all clergymen visiting the prison, whether regularly on the payroll of the State of New York or attending as visiting clergymen shall be required.

3. Clergymen may wear such robe or religious raiment as they may desire and inmates may wear such religious insignia which, in the reasonable opinion of the Warden, will not incite to prison disturbance in the inmate population.

4. Prison inmates, who desire to learn about the religious practice of any sect, including the Muslim religion, may attend religious services at the time and place to be appointed by the Warden, subject only to reasonable restrictions as to space and prison security.

5. Muslims shall be provided whenever possible with meals that are wholly free of pork and pork products, and when that is not practicable then there shall be available at each meal some food free of those substances.

6. Inmates may subscribe to any publication to which they may wish to subscribe, including "Muhammad Speaks", but such publication shall be subject to censorship by the Warden, including the exclusion of said publication if in the reasonable opinion of the Warden the publication represents a threat to the security of the penal institution.

8. On August 4, 1966, Judge Henderson granted the motion of plaintiff Lionel X. Jones to amend his complaint to add a claim for money damages and the *pro se* amended complaint was filed on August 5, 1966. The amended complaint for money damages of plaintiff Willis X. Bryant, Jr. was filed on September 20, 1966, pursuant to Judge Henderson's order of that same date. Judge Henderson granted plaintiff Arthur Johnson's request to amend his complaint to add a claim for money damages on September 28, 1966. A handwritten, *pro se* complaint was received by the Clerk but was apparently never filed.

and was subject to seizure at any time; they were denied the right to observe the Muslim dietary laws; the wearing of a Kufi (fez), medallions or other ornamental or ceremonial accoutrements of the Muslim faith was prohibited. This testimony was believable and was not contested by the defendant.

Each plaintiff also testified that he had been subjected to harassment and repeated disciplinary measures, including keeplock and punitive confinement, because of his Muslim affiliation. Plaintiff Bryant testified that he had been held in segregative confinement during the period 1963 through 1965 and that he had been confined to a strip cell for a considerable amount of time as well. Plaintiffs Jones and Johnson both testified that they had been assigned to the most menial of work details, the "Buckwheat company" (grounds clean-up crew), for long periods of time because they were adherents of the Muslim faith.

Plaintiffs submitted as evidence copies of their institutional disciplinary records and their entire parole files.

No references to Muslim-related activities appear in plaintiff Jones' disciplinary records.

Plaintiff Bryant's disciplinary records indicate that on March 12, 1967, he was required to forfeit 30 days of yard and recreational privileges for "[a]ttending and taking part in an unauthorized meeting of Muslim inmates in 'A' Block yard." On December 1, 1968, plaintiff Bryant again forfeited 30 days of yard and recreational privileges for "[p]articipating in an unauthorized service in the yard." The nature of the service is not indicated. Plaintiff Bryant's records also indicate that he was penalized on a number of occasions for unauthorized meetings in the Attica yards but, again, the nature of such meetings is not specified.

On March 18, 1960, plaintiff Johnson was "counseled" when "fanatic religious writings" were found in his possession. No other specific references to Muslim or other religious activities appear in his disciplinary reports.

References to plaintiffs' Muslim activities appear in each of their parole files and provide additional corroboration of their Muslim affiliation. However, after reviewing these files I find that there is no indication that any parole decisions or institutional job assignments were negatively influenced by this fact.

Defendant McGinnis offered no additional testimony or evidence to rebut plaintiffs' proof. He relies primarily on the "good faith" defense as recognized in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), to shield him from liability against plaintiffs' complaints.

## DISCUSSION

In recent years, courts have clarified the nature of inmates' first amendment religious rights and have more clearly defined the extent to which inmates are entitled to practice their professed religion within a correctional facility. *See, e. g., Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973); *Knuckles v. Prasse*, 302 F.Supp. 1036 (E.D.Pa.1969), aff'd, 435 F.2d 1255 (3d Cir. 1970), cert. denied, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971).

At the time that plaintiffs first instituted their action in this court, it had long been recognized that "[a] prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." *Coffin v. Reichard*, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945).

In 1964, the Second Circuit Court of Appeals articulated the standards which govern in the case before me. To the extent that Muslimism was considered to be a religion, "those who profess to follow its teachings have some measure of constitutional protection, even though they are confined to prison and are subject to prison discipline." *Sostre v. McGinnis, supra*, 334

F.2d at 908, *citing Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), and *Pierce v. LaVallee*, 293 F.2d 233 (2d Cir. 1961). Whatever rights to which Muslims were entitled because of the religious content of Muslimism were subject to careful circumscription by rules and regulations that would enable prison authorities to maintain order and discipline. *Sostre v. McGinnis, supra* at 911.

Guided by these standards, I make the following findings based on the trial testimony and my review of the full record in this case:

(1) Plaintiffs are not entitled to relief for the period prior to October 26, 1964, when the United States Supreme Court denied certiorari in *Sostre v. McGinnis*, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964), thus finally resolving the issue of whether or not Muslimism was, in fact, a religion.

Until that time, defendant McGinnis enjoyed immunity from prosecution for those contested actions taken with respect to Muslims and within the sphere of his official responsibility because he could not be expected to predict the future course of litigation in this matter. *Procunier v. Navarette*, 434 U.S. 555, 560, 98 S.Ct. 855, 55 L.Ed.2d 14 (1978). Arguably, defendant McGinnis was on notice that Muslimism was a religion following the decision of the New York State Court of Appeals in *Brown v. McGinnis, supra*. However, since an *explicit* finding that Muslimism was a religion was not made until Judge Henderson so ruled on October 14, 1963, I choose to date defendant McGinnis' knowledge of this fact from the time designated above.

(2) Plaintiffs are not entitled to relief for any claims relating to the period after May 6, 1966, when defendant McGinnis filed with this court revised rules and regulations governing the practice of the Muslim faith which Judge Henderson twice typified as "evidence of a good-faith effort by prison officials to comply with the order of this court and with the spirit of the decision of the Circuit Court of Appeals." *See In the Matter of the Application of Abu Jimmy X. Scott, supra; In the Matter of the Applications of Freddie X. Youngblood, et al., supra*.

Although all plaintiffs testified that restrictions on the practice of their religion were not lifted until 1970 or 1971, there was no proof offered by plaintiffs, and none appears elsewhere in the record, that defendant McGinnis was responsible for this fact. Nor is there any other indication in the record that the defendant was not proceeding in good faith after May 6, 1966 to enable inmates to practice Muslimism in a regulated fashion. Defendant McGinnis cannot be held liable for practices where plaintiffs have failed to prove his personal complicity. *See, e. g., Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.), *cert. denied sub nom. Employee-Officer John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973).

(3) Plaintiffs are not entitled to relief on their claims that they were subjected to disciplinary reprisals because of their Muslim affiliation.

The official records indicate only minor instances where sanctions were imposed for plaintiffs' Muslim or other "religious" activities. A presumption of regularity attaches to these official records. Plaintiffs' only proof to the contrary, their own testimony, is simply not sufficient to convince me that many of the disciplinary reports and sanctions were, in fact, for Muslim-related activities.

(4) There is one period for which defendant McGinnis has failed to establish that he was proceeding in good faith and during which he should have known that his conduct violated plaintiffs' first amendment rights. I find that from October 26, 1964, when the United States Supreme Court denied certiorari in *Sostre v. McGinnis, supra*, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96, until May 6, 1966, when he filed revised rules and regulations with this court, defendant McGinnis acted with such disre-

gard for the established law that his conduct "cannot reasonably be characterized as being in good faith." *Procunier v. Navarette, supra,* 434 U.S. at 562, 98 S.Ct. at 860; *Wood v. Strickland, supra* 420 U.S. at 322, 95 S.Ct. 992.

Plaintiffs' uncontested and unimpeached testimony indicates that they had no meaningful opportunity to practice any aspect of their religion during this 18-month period while they were incarcerated in the Attica State Prison despite the fact that Muslimism had clearly been recognized as a religion by the federal courts in this action.

There is no indication in the record that during this period defendant McGinnis took any affirmative steps to recognize Muslimism as a religion, pursuant to judicial mandate. In fact, as late as March 1965, the defendant was still claiming *on the record* that Muslimism was not a religion. *Bryant v. Wilkins, supra,* 258 N.Y.S.2d at 458–459. Nor is there any indication that defendant McGinnis attempted to comply with § 610 of the Corrections Law which provides that services, advice and spiritual ministration should be allowed to inmates who are members of a religious sect "in such manner and at such hours as will be in harmony . . . with the discipline and the rules and regulations of the institution."

The record is replete with instances where judges of the state and federal courts advised defendant McGinnis, first, that he must promulgate regulations that would extend to Muslim inmates the rights guaranteed by § 610 of the Corrections Law and, later, that the 1962 Regulations that had been promulgated actually *inhibited* the practice of Muslimism, *SaMarion v. McGinnis,* Civ. 9395, slip op. at 8 (W.D.N.Y. Oct. 14, 1963); *Bryant v. Wilkins, supra,* 258 N.Y.S.2d at 461, and were otherwise in need of revision. *Sostre v. McGinnis, supra,* 334 F.2d at 912. The record indicates that the defendant himself had acknowledged in 1965 that under the 1962 Regulations, Muslim inmates would find it difficult, if not impossible, to practice their religion in New York State prisons, *Bryant v. Wilkins, su-*

*pra,* 265 N.Y.S.2d at 997, a conclusion also reached by Judge Henderson in his order of April 12, 1966, in this matter. *SaMarion v. McGinnis, supra,* 253 F.Supp. at 741.

Clearly, defendant McGinnis could have promulgated standards that would have regulated the practice of the Muslim religion if, in his informed, professional judgment as Corrections Commissioner, he believed that certain Muslim practices may have presented a threat to the institution's order, security, and discipline. However, it is clear that such regulations were not promulgated until May 1966, and then only at the direction of Judge Henderson.

The record is devoid of proof or other explanation that would justify either the defendant's recalcitrant attitude or the lengthy delay before good faith efforts were made to draft reasonable and effective regulations. There is no proof offered either at the initial trial in this court in October 1962 or, to my knowledge, in any of the state court proceedings, that Muslimism was so dangerous that it could not be allowed to exist or to be practiced in any form in New York's prisons. In fact, the record contains evidence to the contrary in a report from the Assistant Warden of the Attica State Prison to the Warden dated July 1, 1961:

> It is my feeling that some of these inmates are really benefiting and have had a decided change in behavior pattern since becoming converts to the religion of Islam and I feel as long as this religion does not interfere with the orderly operation of the institution, we may derive some benefit from it providing we are constantly alert and ascertain the movement is confined to the channel of the religion and not permitted to get out of bounds and be taken over by individuals or groups for their own particular purposes, or to advance themselves in status in the institution.

Trial Transcript at 1187.

I find that defendant McGinnis' refusal to recognize Muslimism as a religion and his failure to promulgate regulations that would enable Muslims to enjoy at least

some religious rights during the period from October 24, 1964 until May 6, 1966, constituted an unconstitutional deprivation of plaintiffs' first amendment rights to practice their religion.

In the context of the entire record, defendant's affidavit of June 23, 1977, submitted in support of a prior motion for summary judgment, is not sufficient to establish that defendant is entitled to avail himself of the good faith defense under *Procunier v. Navarette, supra,* for this period.

### DAMAGES

■ The United States Supreme Court has recognized that damages are available under 42 U.S.C. § 1983 for actions found to have been violative of constitutional rights and to have caused compensable injury. *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Wood v. Strickland, supra,* 420 U.S. at 319, 95 S.Ct. 992. Although the amount of damages for such injuries cannot be determined by reference to an objective standard, sufficient precedent exists to support granting of non-punitive damages for the deprivation of intangible rights for which no pecuniary loss can be shown. *See, e. g., Nixon v. Herndon,* 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Jeanty v. McKey & Poague, Inc.,* 496 F.2d 1119 (7th Cir. 1974); *Basista v. Weir,* 340 F.2d 74, 88 (3d Cir. 1965); *Larkins v. Oswald,* 364 F.Supp. 1374 (W.D.N.Y.1973), *aff'd,* 510 F.2d 583, 590 (2d Cir. 1975).

■ Plaintiffs Willis X. Bryant, Lionel X. Jones, and Arthur Johnson are each awarded $3,000.00 in compensatory damages. Since Muslims presently enjoy the full spectrum of first amendment rights to practice their religion in New York State prisons, an award of punitive damages would serve no purpose.

Permission to appeal *in forma pauperis* from the adverse portions of this decision is denied to plaintiffs with the exception that plaintiffs may file a notice of appeal with the Clerk of the United States District Court, United States Court House, Buffalo, New York, without the payment of filing fees.

Further requests for permission to appeal in forma pauperis should be directed, on motion, to the United States Court of Appeals for the Second Circuit, Foley Square, New York City, in accordance with the requirements of Rule 24(a) of the Federal Rules of Appellate Procedure.

So ordered.